IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-01564-MSK

COLORADO WILD PUBLIC LANDS, INC,

      Plaintiff,

v.

GREG SHOOP, in his official capacity as Acting Colorado State Director of the
U.S. Bureau of Land Management;
RYAN ZINKE, is his official capacity as Secretary of the Interior; and
U.S. BUREAU OF LAND MANAGEMENT,

      Defendants.

LESLIE WEXNER and ABIGAIL WEXNER,

      Intervenor-Defendants.

---

**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF PETITION FOR REVIEW**

---

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND .......................................................................................2

I.     The properties involved in the Land Exchange ...................................................2

     A.     The Sopris Parcel ............................................................................2
     B.     Sutey Ranch ....................................................................................4
     C.     West Crown Parcel .........................................................................5
     D.     Eagle County Parcels .....................................................................5

II.     BLM's approval of the Land Exchange ..............................................................5

STANDARD OF REVIEW ..........................................................................................8

ARGUMENT ................................................................................................................9

I.     The Court has jurisdiction over Plaintiff's challenge to BLM's Land Exchange ....9

II.     BLM violated the National Environmental Policy Act .....................................13

     A.     Statutory Background ...................................................................13

     B.     BLM's insignificant-impact conclusion was based on an incomplete
          analysis and issued without record support ...................................14

          1.     The impacts from livestock on Sopris Parce resources
               do not support an insignificance conclusion ...................15

          2.     BLM did not fully analyze recreation impacts on Sutey Ranch's
               wildlife resources ...........................................................21

     C.     BLM did not comply with notice and comment procedures ............24

          1.     BLM withheld the appraisals .........................................25

          2.     BLM reconfigured the amount of Sutey Ranch acreage included
               in the Land Exchange after the comment period, precluding public
               participation ...................................................................27

III.    BLM violated the Federal Land Policy and Management Act .................................30

    A.    FLPMA and implementing regulations .................................30

    B.    BLM's market value determination for the Sopris Parcel unlawfully undervalues this federal property .................................31

        1.    The highest and best use of the Sopris Parcel includes vehicle access .................................31

        2.    The appraisal failed to consider relevant comparable sales .................36

    C.    BLM's public-interest determination conflicts with record evidence .................39

IV.    The Court should award Plaintiffs their requested relief .................................42

CONCLUSION .................................43

**TABLE OF AUTHORITIES**

**CASES:**

*Airport Neighbors Alliance v. U.S.*,
  90 F.3d 426 (10th Cir. 1996)...................................................................14,21
*Baltimore Gas & Electric v. NRDC*,
  462 U.S. 87 (1983)........................................................................................13
*Bering Strait Citizens for Responsible Resource Development v. U.S. Army
Corps of Engineers*,
  524 F.3d 938 (9th Cir. 2008)........................................................................25
*Ctr. For Biological Diversity v. U.S. Dept. of Interior*,
  623 F.3d 633 (9th Cir. 2010)........................................................................42
*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971)......................................................................................42
*Colo. Envt'l Coal. v. Dombeck*,
  185 F.3d 1162 (10th Cir. 1999)......................................................................9
*Colorado Envtl. Coal. v. Salazar*,
  875 F. Supp. 2d 1233 (D. Colo. 2012)....................................................13,36
*Committee to Save the Rio Hondo v. Lucero*,
  102 F.3d 445 (10th Cir. 1996)......................................................................12
*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)......................................................................................10
*Davis v. Mineta*,
  302 F.3d 1104 (10th Cir. 2002)....................................................................14
*Desert Citizens Against Pollution v. Bisson*,
  231 F.3d 1172 (9th Cir. 2000)..............................................................27,32,34
*Dine Citizens Against Ruining our Environment v. Klein*,
  747 F.Supp.2d 1234 (D. Colo. 2010)......................................................15,19,24
*F.C.C. v. NextWave Pers. Commc'ns*,
  537 U.S. 293 (2003)........................................................................................4
*Forest Guardians v. Babbitt*,
  174 F.3d 1178 (10th Cir. 1999)....................................................................42
*Friends of the Bow v. Thompson*,
  124 F.3d 1210 (10th Cir. 1997)......................................................................8
*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
  528 U.S. 167 (2000)....................................................................................9,10
*Great Basin Resource Watch v. B.L.M.*,
  844 F.3d 1095 (9th Cir. 2016)......................................................................26
*High Country Citizens Alliance v. U.S. Forest Serv.*,
  67 F.Supp.3d 1262 (D. Colo. 2014).............................................................42
*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*,
  702 F.3d 1156 (10th Cir. 2012)....................................................................15
*Huffman v. Saul Holdings Ltd. P'ship*,
  194 F.3d 1072 (10th Cir. 1999)......................................................................9

*Kern v. BLM,*
  284 F.3d 1062 (9th Cir. 2002).................................................................23
*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)......................................................................12,13
*Marsh v. Or. Natural Res. Council,*
  490 U.S. 360, 371 (1989).............................................................12,24,25
*Middle Rio Grande Conservancy Dist. v. Norton,*
  294 F.3d 1220 (10th Cir. 2002)....................................................14,21
*Motor Vehicles Mfrs. Ass'n. v. State Farm Mutual Auto. Ins.,*
  463 U.S. 29 (1983)........................................................................19
*Nat'l Parks & Conservation Ass'n v. BLM,*
  606 F.3d 1058 (9th Cir. 2010).....................................................35
*Nat'l Ski Areas Ass'n v. U.S. Forest Serv.,*
  910 F. Supp. 2d 1269 (D. Colo. 2012)........................................42
*National Audubon Soc. v. Hoffman,*
  132 F.3d 7 (2d Cir. 1997)...........................................................15
*New Mexico v. Dept. of the Interior,*
  854 F.3d 1207 (10th Cir. 2017)..................................................12
*New Mexico v. BLM,*
  565 F.3d 683 (10th Cir. 2009)...............................................9,10,25
*Olenhouse v. Commodity Credit Corp.,*
  42 F.3d 1560 (10th Cir. 1994).....................................................8
*Pennaco Energy v. U.S. Dept. of Interior,*
  377 F.3d 1147 (10th Cir. 2004)................................................8,15
*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989)....................................................................24
*Rocky Mountain Wild v. Vilsack,*
  843 F.Supp.2d 1188 (D. Colo. 2012)..........................................15
*San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv.,*
  657 F.Supp.2d 1233 (D. Colo. 2009).......................................15,19
*Sierra Club v. Fed. Energy Regulatory Comm'n,*
  867 F.3d 1357 (D.C. Cir. 2017)...................................................10
*Sierra Club v. U.S. Dep't of Energy,*
  287 F.3d 1256 (10th Cir. 2002)...................................................12
*Se. Alaska Conservation Council v. U.S. Army Corps of Engineers,*
  486 F.3d 638 (9th Cir. 2007)........................................................42
*Spanish Springs v. DOI,*
  328 Fed. App. 365 (9th Cir. 2009)...............................................31
*Thomas Roosevelt P'ship v. Salazar,*
  616 F.3d 497 (D.C. Cir. 2010)......................................................16
*U.S. v. Benning,*
  330 F.2d 527 (9th Cir. 1964)........................................................32
*Wilderness Soc'y v. Wisely,*
  524 F. Supp.2d 1285 (D. Colo. 2007).........................................15

iv

*WildEarth Guardians v. BLM,*
  870 F.3d 1222 (10th Cir. 2017)..................................................................10,13
*Wyoming Outdoor Council v. Army Corps of Engineers,*
  351 F. Supp.2d 1232 (D. Wy. 2005)..........................................................15,20

## STATUTES AND REGULATIONS:

5 U.S.C. § 702...........................................................................................43
5 U.S.C. § 703...........................................................................................43
5 U.S.C. § 706(2)......................................................................................8,42

42 U.S.C. § 4321......................................................................................13
42 U.S.C. § 4331......................................................................................13
42 U.S.C. § 4332(2)(C)............................................................................14

43 U.S.C. § 1701......................................................................................13
43 U.S.C. § 1701(a)(1).............................................................................30
43 U.S.C. § 1701(a)(9).............................................................................25
43 U.S.C. § 1702......................................................................................24
43 U.S.C. § 1715(a)...............................................................................28,29
43 U.S.C. § 1716(a)...............................................................................27,29
43 U.S.C. § 1716(b).............................................................................7,25,27
43 U.S.C. § 1716(d)..............................................................................7,25
43 U.S.C. § 1716(d)(1).............................................................................30

40 C.F.R. § 1500.1(b)...............................................................................24
40 C.F.R. § 1501.4...................................................................................14
40 C.F.R. § 1501.4(c)...............................................................................14
40 C.F.R. § 1501.4(e)...............................................................................14
40 C.F.R. § 1506.6...................................................................................24
40 C.F.R. § 1508.3...................................................................................14
40 C.F.R. § 1508.7...................................................................................14
40 C.F.R. § 1508.8(a)...............................................................................14
40 C.F.R. § 1508.8 (b)..............................................................................14
40 C.F.R. § 1508.9...................................................................................14
40 C.F.R. § 1508.9(a)...............................................................................14
40 C.F.R. § 1508.13.................................................................................14
40 C.F.R. § 1508.25(c)..............................................................................14
40 C.F.R. § 1508.27.................................................................................14
40 C.F.R. § 1508.27(b)(7)..........................................................................14
40 C.F.R. § 1508.27(b)(10).......................................................................25,28

43 C.F.R. § 46.305(a)...............................................................................25

43 C.F.R. § 46.305(b) ....................................................................................................25

43 C.F.R. § 2200.0-5(k) ...............................................................................................30
43 C.F.R. § 2200.0-5(n) ...............................................................................................30
43 C.F.R. § 2200.0-6(b) ...............................................................................................31
43 C.F.R. § 2201.3 ........................................................................................................30
43 C.F.R. § 2201.3-2 ....................................................................................................30
43 C.F.R. § 2201.3-2(a)(2) ..........................................................................................31
43 C.F.R. § 2201.6(a)(1) ..............................................................................................28
43 C.F.R. § 2201.7 ........................................................................................................27

## INTRODUCTION

The Sutey-Two Shoes Land Exchange was the idea of an Ohio couple to develop an exclusive ranch estate on the northern flanks of the dramatic Mount Sopris in Colorado's Roaring Fork Valley.  After buying the 4,041-acre Two Shoes Ranch in 2006, Leslie and Abigail Wexner looked for ways to add adjacent federal land—the Sopris Parcel—to their ranch.  They bought two other valuable pieces of local real estate (the Sutey Ranch and the West Crown parcel) to trade for the Sopris Parcel and offered financial and other incentives to neighbors, local and federal governments and regional land trusts to facilitate an exchange for the Sopris Parcel.  After their initial proposal failed, the Wexners approached the U.S. Bureau of Land Management (BLM) with the Land Exchange.  BLM acquiesced.

This case challenges BLM's approval of the Land Exchange and the Interior Board of Land Appeals' affirmation of that decision for violations of the National Environmental Policy Act (NEPA) and Federal Land Policy and Management Act (FLPMA).  These two federal laws ensure that when the government decides to trade away public lands to private individuals, it must do so in a transparent, economically fair and environmentally aware manner.  After all, once BLM completes the trade, the public loses access to places they have been enjoying for decades, if not longer, and federal land agencies and federal rules no longer govern.

BLM violated NEPA in three ways.  BLM's no-significant-impact conclusion about livestock impacts ignores the agency's own findings about harmful effects of grazing on the Sopris Parcel resources and that conservation measures BLM previously imposed will not apply.  Second, the agency failed to evaluate the impacts of recreation on wildlife within the newly acquired private lands (Sutey Ranch).  Last, BLM failed to adhere to NEPA's public notice requirements—BLM withheld from public review its property appraisals and its removal of the

lands originally included in the Land Exchange.

BLM's violations of FLPMA concern the two rules that condition federal land exchanges. FLPMA's equal-value requirement looks at the relative market values of the properties involved. Here, BLM vastly undervalued the key piece of public land being traded away: by failing to consider the future use of this property and by dismissing the real estate transactions involving the Land Exchange's proponent. A FLPMA public-interest determination ensures the public is gaining resource values through an exchange. But BLM's determination is legally defective: it misstates the agency's ability to manage the Sopris Parcel, ignores the significant resources values found on the federal lands and was not specific to the private lands actually included in the Land Exchange.

Accordingly, Plaintiff Colorado Wild Public Lands' Petition for Review should be granted. For relief, Plaintiff requests that the Court vacate the Land Exchange and, consistent with BLM's representations, issue an injunction ordering the Exchange's participants to unwind the various real estate and financial transactions.

## FACTUAL BACKGROUND

### I.      The properties involved in the Land Exchange

The Land Exchange involves six pieces of federal land and two parcels of private property. Most of the properties are mostly located in the Roaring Fork Valley, near Carbondale, Colorado. The main pieces are the BLM-managed Sopris Parcel and the Wexners' Sutey Ranch.

A.      <u>The Sopris Parcel</u>

This 1,240-acre BLM parcel sits just north of Mount Sopris, a few miles from Carbondale. AR2704.   It is bordered on the south by national forest lands and on the north by a residential subdivision—the Prince Creek Subdivision.  To the east and west lies the Wexners'

4,041-acre Two Shoes Ranch. *Id.*[1]

The Sopris Parcel is known for its natural environment, geologic features and wildlife.

Two creeks flow through the Sopris Parcel—Thomas Creek and Potato Bill Creek—running east

to west. AR2704; AR1661 ("Portions of Potato Bill Creek, Thomas Creek and other tributaries

and drainages cross over the Property, providing valuable wildlife and riparian habitat as well as

helping to shape important areas of upland habitat, including high-quality sagebrush habitat,

which is declining in Colorado and important to several species that depend on it."). The "Lion's

Mane" is a striking vertical cliff that rises up on the north side of Potato Bill Creek and is visible

from Highway 133, which itself is designated as the West Elks Scenic Byway. AR1661. The

Sopris Parcel "provides outstanding and varied natural habitat for many wildlife and plant

species." AR1660. The property contains "critical habitat for the Mount Sopris bighorn sheep."

AR 1661. *See* AR3101 ("Rocky Mountain bighorn sheep are known to occur on [the Sopris

Parcel]); AR3102 ("[I]mportant habitat for bighorn has been mapped on [the Sopris Parcel]"). It

"also provides important winter habitat for mule deer and elk, calving grounds for elk and habitat

for songbirds sensitive to human disturbance." AR1661. "A portion of the property is also habitat

for Harrington penstemon, a plant species recognized as a 'sensitive' plant species by Colorado

BLM." AR1661. Due to these natural resource features, "the northern half of the Property is

located within the Crown Potential Conservation Area, designated by the Colorado Natural

Heritage Program as a conservation priority for its biodiversity rank of B2 (very high

significance)." AR1661.

BLM administers and manages uses of the Sopris Parcel. Livestock grazing has been

authorized by two BLM permits throughout the Sopris Parcel. AR3077. BLM's permittee also

---

[1]     Two other nearby federal parcels are part of the Land Exchange, Parcel B and B-1,
totaling 29 acres. AR2696.

graze livestock on the adjacent Two Shoes Ranch under a private lease from the Wexners. *Id*. Due to its topography, location, water sources and wildlife, the Sopris Parcel is used for hiking, horseback riding, skiing and other recreational activities. AR2716.  In the fall, public use of this BLM land swells as hunters look to bag bighorn sheep, deer and elk. AR2704; Auerbacher Dec. ¶¶ 2-7; Greenway Dec. ¶ 6.

  B.  <u>Sutey Ranch</u>

  The privately owned Sutey Ranch is located in Garfield County, three miles north of Carbondale, Colorado. AR2499.  It sits adjacent to federal lands known as Red Hill, an area designated by BLM in 1999 as a Special Recreation Management Area and which receives over 55,000 recreationists a year. ECF Doc. 1, ¶ 24; ECF Doc. 21, ¶ 24; AR 2499.  From the 1930s until 2005, the Sutey family farmed and grazed cattle on the property, while maintaining a homesite on 37 acres. AR93; AR2499, 2501.  The ranch held "water shares" in the local irrigation company that were used to irrigate 93 acres for growing hay. AR2499. *See* AR3280, 3282.

  Some believed the Sutey family would sell the property so that ranchettes could be built, AR2970.  To facilitate the Land Exchange, the Wexners purchased 520 acres of the Sutey Ranch for $6,500,000 in 2008, when it was first put on the market, and acquired the remaining 37 in 2010. AR250, AR2993.  BLM was receptive to acquiring Sutey Ranch from the Wexners because it sits next to the Red Hill SRMA and would provide additional recreational opportunities. AR2969 ("BLM expects the exchange to enhance recreational opportunities for the public with improved access to public lands, include the popular Red Hill SRMA.").  Sutey Ranch also contains important wildlife habitat. AR2507; AR2970.

C.     West Crown Parcel

The West Crown property is 112 acres of vacant private land along Prince Creek Road, across from the Wexners' Two Shoes Ranch and about three miles southeast of Carbondale. AR2610; AR3287.  It borders and provides access to the Crown, a popular BLM-managed mountain-bike area. AR2625.  Like the Sopris Parcel, the West Crown contains populations of Harrington's penstemon. ECF Doc. 1 ¶ 25, ECF Doc. 21 ¶ 25; AR3144.  The Wexners purchased this parcel in 2010 for $1,950,000, AR2627, in order to complete the Land Exchange, *see* AR879 ("Please note that …the West Crown parcel is new, since the previous legislative exchange proposal.").

D.     Eagle County Parcels

BLM included in the Land Exchange three isolated parcels totaling 196 acres in Eagle County to compensate the Wexners. AR883-84.  Combined, the Eagle parcels were valued at $825,000. AR2775.  The Wexners did not want these properties for themselves, but were acquiring them to sell to the Lady Belle Ranch and recoup some of their costs relating to the Land Exchange. AR2785; AR105 (including Lady Belle parcel "to be conveyed to other private parties for partial recoupment of Wexner's investment in Sutey").  Under the Land Exchange, the Lady Belle Ranch agreed to "grant perpetual conservation easement[]…on all of the Federal lands they acquire" to preclude residential development. AR881-82.

## II.     BLM's approval of the Land Exchange

The Wexners maintain their primarily residence in Columbus, Ohio.  Like many people, they found Colorado's Roaring Fork Valley to be a desirable place for a vacation home and so they bought the 4,041-acre Two Shoes Ranch for $65 million through two purchases in 2002 and 2006. ECF Doc. 1, ¶ 20; ECF Doc. 21, ¶ 20.  Though the ranch estate is large, BLM's Sopris

Parcel divides the property. ECF Doc. 1, ¶ 21; ECF Doc. 16, ¶ 21.

The Land Exchange began as a legislative effort by the Wexners, who hired a local real estate attorney, Gideon Kaufman, and a consulting firm, the Western Land Group, to develop a proposal for Congressional approval, which would avoid federal laws like FLPMA and NEPA. AR101, 102. *See* AR881 ("[The Wexners] had explored the possibility of seeking congressional approval of a bill directing BLM to complete the exchange."). The legislative land exchange included BLM conveying the Sopris Parcel and the Wexners conveying 520 acres of Sutey Ranch.

The Wexners lobbied the community to get support for the proposal. AR101. In January 2009, they entered into a contract with the Prince Creek Subdivision—located adjacent to the Two Shoes Ranch and the Sopris Parcel—for a Recreation Easement that allows these homeowners to continue to use the Sopris Parcel. AR1242.[2] The Wexners also agreed to pay the Prince Creek homeowners $75,000 to improve their water system. ECF Doc. 1, ¶ 31; ECF Doc. 21, ¶ 31. To BLM, the Wexners offered $50,000 to develop a Sutey Ranch management plan. For Pitkin County, the couple agreed to "donate" $950,000 for certain county projects and place a conservation easement precluding residential development on the Sopris Parcel. AR101, AR106. But Pitkin County refused to support the land exchange for a number of reasons, including concerns about losing public lands and that the Wexners would realize an "excessive economic benefit." AR106. Without Pitkin County support, the Wexners abandoned the legislative approach. ECF Doc. 1, ¶ 27; ECF Doc. 21, ¶ 27.

In early 2011, the Wexners proposed a FLPMA land exchange to BLM. ECF Doc. 1, ¶

---

[2]     Pitkin County found this objectionable, stating it "doesn't believe that…recreational access should be limited to a discreet group but should be available to the general public." AR1238; AR105. This sentiment is shared by members of Colorado Wild Public Lands. Greenway Dec. ¶ 8; Rickenbaugh Dec. ¶ 9; Auerbacher Dec. ¶ 6.

28; ECF Doc. 21, ¶ 28. *See* AR878.  Knowing that FLPMA requires an equal-value exchange, the Wexners purchased in 2010 the missing 37 acres on Sutey Ranch and the 112-acre West Crown parcel. ECF Doc. 1, ¶ 28; ECF Doc. 21, ¶ 28; AR878.  The Wexners also bumped up their BLM payment to $1,100,000 for developing and implementing a management plan for Sutey Ranch and the West Crown, AR879, and agreed to place a conservation easement on the Sopris Parcel to prevent residential development.  BLM also agreed to convey its three Eagle County parcels to the Wexners.

The Wexners secured Pitkin County's support by entering into an agreement on January 22, 2013. AR3439.   In exchange for Pitkin County's support, the Wexners agreed to place a conservation easement on 365 acres of the Two Shoes Ranch, extinguish development rights in a nearby subdivision (Crystal Valley Ranch) and contribute $700,000 to county recreational projects. ECF Doc. 1, ¶ 30; ECF Doc. 21, ¶ 30; AR3440-41; AR1365.  The conservation easement would be placed on the north and south side of Potato Bill Creek to protect the area's significant natural resource values from residential development. AR3557, AR3560, AR3581, AR3584.

BLM initiated a NEPA process for the Land Exchange with public scoping in May 2012. AR3000.  A draft Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) was circulated for public review and comment over a 30-day period beginning on April 29, 2013. ECF Doc. 1, ¶ 33; ECF Doc. 21, ¶ 33.

Due to FLPMA's equal-value requirement, 43 U.S.C. § 1716(b) & (d), BLM had appraisals prepared for each piece of property involved in the Land Exchange.  The appraisals were completed in November 2012, ECF Doc. 1, ¶ 34 ; ECF Doc. 21, ¶ 34.  Although they were available, BLM withheld them from the public during the 30-day comment period on the draft

7

Environmental Assessment. ECF Doc. 1, ¶ 34; ECF Doc. 21, ¶ 34.

After the public comment period, BLM and the Wexners decided to modify the scope of the Land Exchange because of problems with satisfying FLPMA's equal-value requirement. ECF Doc. 1, ¶ 35; ECF Doc. 21, ¶ 35.  Because BLM's valuation of the Sopris Parcel was low, the Wexners' holdings (Sutey Ranch and West Parcel) exceeded the value of the federal properties. AR2971.  As a result, BLM included only 322 of Sutey Ranch's 557 acres in the Land Exchange to equalize the market values. *See* AR3286.  BLM would receive the remaining 235 acres as a donation in a separate transaction. AR2971.

BLM approved the Land Exchange on June 20, 2014. AR2974.  Plaintiff challenged BLM's 2014 approval immediately through available administrative channels.  Awaiting a decision from the Interior Board of Land Appeals (IBLA), BLM and the Wexners prepared closing documents to implement the Land Exchange that ensured the various transactions could be undone in the event that Plaintiff succeeds.  The IBLA upheld BLM's decision on March 27, 2017 and the Land Exchange closed immediately.  This lawsuit followed.

## STANDARD OF REVIEW

The Administrative Procedure Act provides the standard of review for BLM's Land Exchange.  Courts "shall…hold unlawful and set aside agency action" that is "arbitrary [and] capricious" or "otherwise not in accordance with law." 5 U.S.C. § 706(2).

An action is "arbitrary and capricious" when agencies do not "consider[] the relevant factors," *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997), or fail to support their decision with facts in the administrative record, *Pennaco Energy v. U.S. Dept. of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) ("In addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious' standard requires an agency's action to be supported

by the facts in the record."). *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575-76

(10th Cir. 1994) ("After-the-fact rationalization by counsel in briefs or argument will not cure

noncompliance by the agency[.]").  Moreover, a decision is arbitrary and capricious when the

agency "relied on factors which Congress had not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that could not be ascribed to a

difference in view or the product of agency expertise." *Colo. Envt'l Coal. v. Dombeck*, 185 F.3d

1162, 1167 (10th Cir. 1999) (quoting *Motor Vehicles Mfrs. Ass'n. v. State Farm Mutual Auto.*

*Ins.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

I.      **The Court has jurisdiction over Plaintiff's challenge to BLM's Land Exchange.**

An organization has Article III constitutional standing "when its members would

otherwise have standing to sue in their own right, the interests at stake are germane to the

organization's purpose, and neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl.*

*Servs.*, 528 U.S. 167, 181 (2000).  Plaintiff Colorado Wild Public Lands can sue on behalf of its

members because the interests it seeks to protect are germane to its purpose, Rickenbaugh

Declaration ¶¶ 3-4, Froelicher Decl. ¶ 2, and because neither the claims asserted nor relief

requested requires individuals to participate. *See New Mexico v. BLM*, 565 F.3d 683, 693 n.13

(10th Cir. 2009).[3]

---

[3]      Jurisdictional issues like standing can be raised at any time during a lawsuit, including
on appeal, by any party and the court. *Huffman v. Saul Holdings Ltd. P'ship*, 194 F.3d 1072,
1076-77 (10th Cir. 1999).  Plaintiff asked for permission to conduct jurisdictional discovery,
ECF Doc. 27 at 9,11 & ECF Doc. 34 at 3, because BLM and the Wexners have stated they
intend to challenge Plaintiff's standing and raise mootness as a defense. ECF Doc. 20 at 2; ECF

Further, Colorado Wild Public Lands' members satisfy the three-part test for individual standing.  That test is as follows: 1) a concrete, particular, and actual or imminent "injury in fact;" 2) those injuries are "fairly traceable" to the agency action; and 3) a favorable decision and remedy are likely to redress those injuries. *Laidlaw*, 528 U.S. at 180-81.  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id*. at 183. *See New Mexico*, 565 F.3d at 693 n. 13 (finding intent to "to use [public lands] in the future for specified aesthetic, recreational, and employment pursuits that would be harmed by development" confers standing to challenge federal management plan).[4]

Here, several Colorado Wild Public Lands members would suffer an injury from the transfer of public lands to the Wexners.  Anne Rickenbaugh, Hawk Greenway, Franz Froelicher, Diane Kenney, Jean Perry and Glen Auerbacher are members of Colorado Wild Public Lands, live adjacent to or near the Sopris Parcel and have regularly used these unique lands that being traded away as part of the Land Exchange. Rickenbaugh Dec. ¶¶ 5-7; Froelicher Dec. ¶¶ 3-7; Greenway Dec. ¶¶ 5-7; Auerbacher Dec. ¶¶ 2-6; Kenney Dec. ¶¶ 4-9; Perry Dec.[5]  On these public lands, members walk, hike, hunt, view wildlife and native wildflowers, take pictures, birdwatch, educate children and other residents of Roaring Fork Valley, and engage in spiritual

---

Doc. 21 at 13; ECF Doc. 11 at 11.  The Court ruled that jurisdictional discovery can wait until BLM or the Wexners raise the issue in a motion or during merits briefing, at which time discovery can occur. ECF Doc. 35 at 6.

[4]      Once plaintiffs establish an injury, they may attempt to invalidate the action "by identifying all grounds on which the agency may have failed to comply with its statutory mandate." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 n.5 (2006); *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1232 (10th Cir. 2017) ("[T]he legal theory and the standing inquiry need not be linked as long as redressibility is met."); *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1366 (D.C. Cir. 2017) ("The [legal] deficiency need not be directly tied to the members' specific injuries.").

[5]      These supporting declarations have been submitted as exhibits to this Petition for Review of Agency Action.

ceremonies. *Id*.[6]  They testify that the Sopris Parcel provides a different type of recreational experience than available on the Sutey Ranch: the Sopris Parcel is more scenic, remote, quiet and challenging than Sutey Ranch; it offers opportunities to see and hunt bighorn sheep, which are absent from the Sutey Ranch; and the Sopris Parcel provides access flowing creeks and to Mount Sopris. Rickenbaugh Decl. ¶ 8; Greenway Decl. ¶ 13.  These members are now precluded from accessing and using the Sopris Parcel. Rickenbaugh Decl. ¶¶ 5-7, 9; Kenney Decl. ¶ 13-14; Auerbacher Decl. ¶¶ 5, 6; Froelicher Decl. ¶ 3, 5, 6; Greenway Decl. ¶¶ 5, 6.[7]  Plaintiff's members make clear, however, that they would continue to use the Sopris Parcel, as they have for years, had BLM not approved and closed on the Land Exchange. Greenway Decl. ¶ 7; Rickenbaugh Decl. ¶ 7.

The injuries to Colorado Wild Public Lands' members are traceable to BLM's Land Exchange and related approval documents because that decision conveyed public lands to private interests.  As a result of Land Exchange, members can no longer access the Sopris Parcel and conduct their recreational activities there. *See supra*.

As for the redressibility element, a favorable decision would alleviate these injuries by invalidating BLM's decision, undoing the Land Exchange or requiring BLM to undertaking additional steps to comply with NEPA and FLPMA.  Notably, BLM and the Wexners planned for potential injunctive relief when, in March 2017, they completed and executed closing

---

[6]    Plaintiff members' interests in these public lands have been demonstrated, in part, by their active participation in the Land Exchange's administrative process, including: by submitting comments during the NEPA scoping period in May 2012 and on the draft environmental assessment in May 2013; and by filing an administrative protest filed in August 2014 and an appeal to the Interior Board of Land Appeals in December 2014. Rickenbaugh Decl. ¶¶ 4, 15; Greenway Decl. ¶ 11; Kenney Decl. ¶ 3; Auerbacher Decl. ¶ 2; Froelicher Decl. ¶ 8.

[7]    The Prince Creek homeowners and one other individual (Garry Snook), however, have been granted exclusive use of the Sopris Parcel to the exclusion of all other users. Greenway Decl. ¶ 8 and Exhibit 1; Rickenbaugh Decl. ¶ 8; Auerbacher Decl. ¶ 6. *See* AR1242-46.

documents in a manner that ensures that the various transactions involved can be undone and all parties "could be returned to their original positions in the event of an adverse ruling on the merits." AR749; AR750 (contending Colorado Wild Public Lands "will not be harmed if the land exchange closes because the parties can be restored to their original positions if an adverse decision is received").

Additionally, the concrete interests of Colorado Wild Public Lands' members are injured by BLM violating required procedures. *See New Mexico v. Dept. of the Interior*, 854 F.3d 1207, 1215 (10th Cir. 2017).  When a case involves alleged violations of NEPA and FLPMA procedures, the standing analysis is slightly different.  First, injury-in-fact is an "increased risk of environmental harm" that threatens plaintiff's concrete interest. *Committee to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 449 (10th Cir. 1996) (citing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 (1992)). *See, e.g.*, *Sierra Club v. U.S. Dep't of Energy,* 287 F.3d 1256, 1265 (10th Cir. 2002).  For this type of injury, the causation and redressibility prongs are relaxed, "or at least conceptually expanded." *Defenders of Wildlife*, 504 U.S. at 572 n.7; *WildEarth Guardians v. Envt'l Protection Agency*, 759 F.3d 1196, 1205 (10th Cir. 2014); *Committee to Save the Rio Hondo*, 102 F.3d at 449.  For causation, "the plaintiff need only trace the risk of harm to the agency's alleged failure to follow the National Environmental Policy Act's procedure." *Committee to Save the Rio Hondo*, 102 F.3d at 452 (under NEPA, "an injury results not from the agency's decision, but from the agency's *uninformed* decisionmaking") (emphasis in original). *See also Defenders of Wildlife*, 504 U.S. at 572 n.7 ("even though the dam may not be completed for many years"); *Sierra Club,* 287 F.3d at 1265 ("the harm itself need not be immediate").  And "to establish redressibility [a plaintiff] need show only that the injury—lack of an informed decision—could be redressed by requiring the agency to make a more informed decision."

*WildEarth Guardians*, 759 F.3d at 1205. *See id*. (plaintiff is required to show only "that compliance with procedural requirements *could* have better protected its concrete interests") (emphasis in original); *Defenders of Wildlife*, 504 U.S. at 573 (redressibility test satisfied "even though he cannot establish with any certainty that the [EIS] will cause the license to be withheld or altered").

Here, Colorado Wild Public Lands suffered an increased risk of harm to its concrete interests in the Sopris Parcel and this increased risk was caused by BLM's non-compliance with NEPA and FLPMA procedures. The procedural requirements found in these laws protect the environment and public lands. *See* 42 U.S.C. §§ 4321 (NEPA's purpose), 4331 (NEPA's policy); 43 U.S.C. § 1701 (FLPMA's policies).  And while compliance may not ensure that Land Exchange is forever vanquished, undergoing the proper analyses that NEPA and FLPMA require could lead to that result.

## II.     BLM violated the National Environmental Policy Act.

### A.     Statutory Background

NEPA is a procedural statute imposing two main directives on federal agencies. *New Mexico*, 565 F.3d at 703.  First, federal agencies must fully analyze—take a "hard look"—at the environmental impacts of their proposed actions to ensure an informed decision. *Id.* at 704. "[T]he agency's hard look [must] be undertaken objectively and in good faith, not as a subterfuge designed to rationalize a decision already made or to purposefully minimize negative side effects." *Colorado Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1250 (D. Colo. 2012) (citations omitted).  Second, NEPA mandates agency transparency by keeping the public informed and involving them in the decisionmaking process. *Baltimore Gas & Electric v. NRDC*, 462 U.S. 87, 97 (1983) (requiring agency to "disclose[] the environmental impact of its actions"); *Marsh v.*

*Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) ("NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time").  Through these requirements, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh*, 490 U.S. at 371.

The NEPA process requires federal agencies to circulate for public review an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  Federal agencies may first prepare an EA that includes "sufficient evidence and analysis" to determine whether impacts are significant enough to warrant an EIS. 40 C.F.R. §§ 1508.3, 1501.4(c), (e), 1508.9(a).  In reviewing a project and deciding whether its impacts are significant, an agency must evaluate the impacts' "context" and "intensity," 40 C.F.R. § 1508.27, and consider all "direct," "indirect" and "cumulative" impacts, *id*. §§ 1508.7, 1508.8(a) & (b), 1508.25(c), 1508.27(b)(7).  If, after considering all these relevant factors, an environmental assessment shows that an EIS is unnecessary, the agency must issue a "finding of no significant impact" (FONSI) that provides a convincing statement of reasons as to why the action "will not have a significant effect on the human environment." *Id*. §§ 1508.9, 1508.13.  An EIS is required, however, whenever impacts "may" be significant—when significant impacts are "possible." *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1224 (10th Cir. 2002); *Airport Neighbors Alliance v. U.S.*, 90 F.3d 426, 429 (10th Cir. 1996).

B.   BLM's insignificant-impact conclusion was based on an incomplete analysis and issued without record support.

An agency's "finding of no significant impact" is a NEPA conclusion reviewed under the arbitrary and capricious standard. *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002).  Like any agency decision, BLM must support its NEPA findings with a reasoned explanation and

record evidence. *See Pennaco Energy*, 377 F.3d at 1156-57. *See, e.g.*, *Wilderness Soc'y v. Wisely*, 524 F. Supp.2d 1285, 1311-12 (D. Colo. 2007) (finding BLM decision arbitrary because "EA does not adequately explain why the 'no surface occupancy' alternative was dropped" and "[n]o evidence in the record supports the Colorado State Office's 'assumption' that directional drilling was technically and economically infeasible").  Further, measures purporting to reduce or mitigate adverse impacts below a NEPA significance level must be sufficiently developed and factually supported. *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1172 (10th Cir. 2012); *National Audubon Soc. v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997).[8]

1.   The impacts from livestock on Sopris Parcel resources do not support an insignificance conclusion.

BLM's own findings in 2012 reveal that livestock grazing within the Sopris Parcel is causing significant adverse impacts to Harrington's penstemon populations and riparian vegetation along Thomas Creek.  Two BLM grazing permits—known as the Thomas permit and Potato Bill permit—overlap the entire Sopris Parcel. AR3077; *see, e.g.*, AR 3504-56.  The Sopris Parcel "contains extensive habitat" for the Harrington's penstemon,[9] a wildflower BLM

---

[8]   *See, e.g.*, *Wyoming Outdoor Council v. Army Corps of Engineers*, 351 F. Supp.2d 1232, 1251 (D. Wy. 2005) ("Rather than being detailed and justified by some evidence in the record that would support their efficacy, the mitigation measures mandated by [the permit] are vague and speculative."); *San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv.*, 657 F.Supp.2d 1233, 1245-46 (D. Colo. 2009) (rejecting measure because federal agency did not "evaluate[] the efficacy of many of the proposed safeguards"); *Dine Citizens Against Ruining our Environment v. Klein*, 747 F.Supp.2d 1234, 1259 (D. Colo. 2010) (noting "permit revision decision document contains only vague reference to 'mitigation/data recovery plans' which will be conducted"); *Rocky Mountain Wild v. Vilsack*, 843 F.Supp.2d 1188, 1197 (D. Colo. 2012) (rejecting reliance on mitigation when agency only provided "cursory discussion" of reclamation activities it plans to perform following the logging).

[9]   Harrington's penstemon is found on more than 56 acres of the Sopris Parcel. AR3141-42 (identifying "more than 830 Harrington's penstemon plants"); AR1601 ("Please note, additional

determined is a "sensitive species" because of dwindling populations and ongoing threats. AR1601.[10]

In 2012, BLM determined that livestock are damaging populations of Harrington's penstemon on the Sopris Parcel. AR3146 ("[N]early all the flowering stalks had been bitten off in the most heavily grazed areas.").  BLM's 2012 environmental assessment for the Thomas permit renewal explains:

> The flowering stalks of Harrington's penstemon are highly palatable to livestock and wildlife.  Heavy grazing during the flowering season could cause reductions in Harrington's penstemon population if grazing removes a high percentage of the flower stalks annually thereby inhibiting seed dissemination and reproduction.
>
> During surveys to determine the distribution and condition of Harrington's penstemon populations, it was noted that nearly all of the flowering stalks had been bitten off in the more heavily grazed areas of the allotment (Houston, pers comm). Harrington's penstemon generally flowers between June 1 and June 30. The existing grazing schedule encompasses the entire flowering period and heavy grazing appears to be occurring in the open sagebrush parks which are the primary habitat for Harrington's penstemon. The existing grazing schedule may have a long-term adverse effect on Harrington's penstemon.

AR3522. *See* AR3148 ("During field reconnaissance, livestock grazing was observed to have a negative effect on Harrington's penstemon reproduction…").

Livestock grazing is also causing significant damage to Thomas Creek and its riparian vegetation. AR3515. *See also* AR1602 (BLM Report detailing areas along Thomas Creek where livestock grazing has "significantly impacted" "both wetland and upland habitats").  A BLM

---

habitat for Harrington penstemon is present on Parcel A, however a more detailed inventory would be required to effectively map all occupied habitat.").

[10]      Substantial protections apply to "sensitive species." AR3124 ("[I]t is BLM's policy to initiate proactive conservation measures that reduce or eliminate threats to BLM sensitive species[,] to minimize the likelihood of and need for listing of those species under the [Endangered Species Act]"). *See Thomas Roosevelt P'ship v. Salazar*, 616 F.3d 497, 505 (D.C. Cir. 2010) ("According to the Bureau's Manual on Special Status Species, [] the Bureau shall work 'to improve the condition of special status species and their habitats to a point where their special status recognition is no longer warranted.' … The manual further states that any actions or projects 'authorized by BLM shall further the conservation of ... special status species.'").

evaluation revealed: "the width/depth ratio was out of balance with the stream type; the channel was too wide and shallow in areas. The riparian zone was widening, riparian vegetation was insufficient to protect streambanks during high flow events, and riparian vegetation had poor vigor." AR3515; AR3531 (same).  A 2010 assessment of riparian habitat along Thomas Creek found it in a "functioning-but-at-risk" condition, "trending downward," due to "[l]ivestock grazing, access and invasive plant species." AR3531 ("As a result of the Land Health Assessment, the Field Manager determined that Thomas Creek within the Thomas Allotment was not meeting Standard 2 for Riparian systems.").

Acknowledging these significant impacts to the wildflower and riparian vegetation, BLM's 2012 decision to renew the Thomas permit imposed "mandatory terms and conditions" (AR3504) to reduce the impact of livestock.  To address the Harrington's penstemon, the permit provides that "[t]he period of use and Animal Unit Months (AUM) will be changed from the previous permit…The period of use will change from 5/16 – 7/10 and 10/10 – 11/10 to 6/13 – 6/27. AUMs [Animal Unit Months] will change from 80 active to 49 active with 31 AUMs put into temporary suspension." AR3512.  BLM explained that a "reduction in [Animal Unit Months],…would help the vegetation resources on the Federal Parcels, including Harrington's penstemon…[and] conditions for Harrington's penstemon would likely be improved by the new grazing system." AR3148. *See* AR 3523 ("The new grazing system [under the 2012 permit renewal] should benefit Harrington's penstemon by reducing use during the flowering period and reducing total grazing use."); AR1239 (noting permit reduced "season from nearly three months to only thirteen days…and reduced AUMs by 29%").[11]

---

[11]     Not only did BLM find that the authorized level of livestock grazing was too high in prior years, but the agency also determined that "there was livestock grazing outside the authorized season of use." AR3531.

BLM's 2012 permit renewal also required the construction of four new stock ponds. AR3511; AR3515.  The ponds would provide alternative water sources for the livestock, improving their distribution within the Sopris Parcel and moving livestock away from riparian areas. AR3511.  BLM expected that implementing the conservation measures included in the permit renewal would "improve riparian conditions and start an upward tread in riparian conditions leading to attainment of land heath standard 2." AR3531 ("Additional livestock watering sites are expected to draw grazing livestock away from riparian areas decreasing the total time that livestock are loafing in them.").

However, these 2012 grazing measures and restrictions vanished under the Land Exchange, as the Sopris Parcel changed ownership from BLM to the Wexners. *See* AR3080 ("Under the Proposed Action, the BLM grazing lease would be cancelled."); AR2945 (same). The Land Exchange included none of the measures designed to protect the Harrington's penstemon and riparian vegetation along Thomas Creek. AR3078 (conceding that "stipulations for the protection of native vegetation [and] riparian areas" would remain only if No Action Alternative was adopted). *Cf.* AR3119 ("Under the No Action Alternative [no Land Exchange], the reduction in AUMs discussed above could benefit aquatic species if it allows the riparian habitat along Thomas Creek to return to a healthier condition.").  As BLM states, "the exchange would result in a net loss of approximately 55.6 acres of Harrington's penstemon habitat." AR3150.  Accordingly, BLM's conclusion that the Land Exchange will result in no significant impact to Harrington's penstemon and riparian areas cannot be reconciled with the agency's own findings and decisions in the 2012 grazing permit renewal.  Without these conditions, livestock have significant impacts to resources within the Sopris Parcel and BLM's finding-of-no-significant-impact conclusion is not supported by the record.

18

Moreover, BLM's NEPA insignificance conclusion cannot be supported by the Sopris

Parcel's conservation easement. AR3080 ("Management of the rangeland of [the Sopris Parcel]

would be dictated by the conservation easements included in the Proposed Action").  Adopted as

part of the Land Exchange, the easement's primary purpose is to restrict residential development

on the property. AR3255 ("these parcels would not/could not be developed in the future");

AR3122 (identifying benefits of conservation easement as "preclud[ing] development and other

activities, including energy and mineral prospecting and development").  It expressly permits

livestock grazing to continue on the Sopris Parcel. AR1663, AR1667, AR3258.  Pitkin County's

comments on the Land Exchange explained the limited utility of the easement when it comes to

addressing livestock impacts:

> While we believe conservation easements work well to prevent residential development,
> they cannot replace BLM's grazing policies, regulations and expertise in regards to
> adaptive grazing monitoring and regulation presently in place.

AR1239.  Added the county, "[i]n our experience, conservation easements offer significantly less

opportunity for effective range management than would continued public administration and

oversight." *Id*.

The conservation easement contemplates the development of a "grazing management

plan." AR1667; AR3259.  But other than noting that a plan may be amended periodically and

must be approved by Colorado Parks and Wildlife, the easement is silent on specifics.  It does

not impose a deadline for preparing a future plan or dictate minimum requirements that would

conserve populations of Harrington's penstemon or improve riparian conditions. *See Klein*, 747

F.Supp.2d at 1259 (noting "the lack of detail as to the nature of the mitigation measures

considered in reaching the finding of no significant impact precludes any meaningful judicial

review"); *San Luis Valley Ecosystem Council*, 657 F.Supp.2d at 1245-46 (noting "spill

prevention control and countermeasure plan as well as stormwater management plan were not even developed, much less evaluated" and thus could not support EA and FONSI)).  The conservation easement does not even describe the extent (number, seasons, days, location) of grazing, acknowledge the adverse effects of livestock, or require the implementation of the same protection measures for the Harrington's penstemon and riparian areas along Thomas Creek that BLM included in the 2012 permit.  BLM cannot rely on the conservation easement to eliminate the known adverse impacts of livestock grazing and support its FONSI. *See Wyoming Outdoor Council*, 351 F. Supp.2d 1251-52.

The IBLA found that BLM did not rely on the Sopris Parcel conservation easement for its FONSI. AR726.  That IBLA finding is wrong.[12]  But even assuming that the conservation agreement played no role in BLM's NEPA conclusion, the agency's 2012 findings alone undermine the FONSI.  BLM did not present new evidence showing that the restrictions imposed to protect Harrington's penstemon populations or riparian habitat along Thomas Creek are no longer necessary.  In fact, the 2014 Environmental Assessment for the Land Exchange reiterates the adverse impacts and the purpose of the 2012 grazing restrictions. AR3146 (Harrington's penstemon "has been affected by livestock grazing in that nearly all of the flowering stalks have been bitten off in the most heavily grazed areas"), AR3148 ("During field reconnaissance, livestock grazing was observed to have a negative impact on Harrington's penstemon

---

[12]     AR3121-22 ("Overall, the conservation easements …would provide for more efficient and improved protection of/management on the Federal and Non-Federal Parcels."); AR3151 (same); AR3149 (addressing impacts to plants, claiming "acres removed from federal management would be protected in perpetuity through conservation easements"). *See* AR3077 ("In order to address the potential effects of the proposed land exchange on grazing allotments and activities on both the Federal and Non-Federal Parcels, this analysis considers the existing conditions [under BLM's two permits] and *the proposed uses under the conservation easements*.") (emphasis added); AR3080 ("Management of the rangeland of [the Sopris Parcel] would be dictated by the conservation easements.).

reproduction, as this species is highly palatable and nearly all of the inflorescences were removed in the most heavily grazed areas of [the Sopris Parcel].”); AR 3150 (noting 2012 permit terms adopted “grazing system…to reduce grazing impacts to Harrington’s penstemon”).

Without BLM’s permit conditions and without knowing the content of a future grazing management plan, BLM’s Finding of No Significant Impact relating to livestock grazing on the Sopris Parcel lacks record support.  As Pitkin County aptly summarized: “significant environmental impacts are likely to result from the elimination of BLM oversight of grazing on the subject lands and the substitution of a conservation easement.” AR1239.  BLM could not rely on a FONSI to comply with NEPA and an EIS should have been prepared. *See Middle Rio Grande Conservancy Dist.*, 294 F.3d at 1224; *Airport Neighbors Alliance*, 90 F.3d at 429.

> 2. <u>BLM did not fully analyze recreation impacts on Sutey Ranch’s wildlife resources.</u>

BLM touts the acquisition of Sutey Ranch because it will provide public recreation space. AR3051 (explaining increasing recreational demand for public lands in Roaring Fork Valley); AR3057-58 (same); AR3054 (“[P]roposed land exchange would be expected to enhance recreational opportunities for the public…”); AR3055 (“[T]he recreational value of this parcel is considered to be very high”); AR3056 (describing enhanced recreational access and trail connections). *See* AR 3290 (noting Land Exchange would “result in the acquisition of valuable conservation and recreational lands by the United States of America”); AR3296 (identifying “provid[ing] public recreational opportunities” as benefit of Land Exchange).  Sutey Ranch’s connectivity to the Red Hill Special Recreation Management Area made these 557 acres particularly attractive, as Red Hill “is very popular and received over 55,000 visitor days per year.” AR3048; AR3050 (noting benefit of acquiring Sutey Ranch is “to secure alternative access points to the Red Hill Area”); AR3051 (Sutey Ranch has “high dispersed recreational

values due to its proximity to the popular non-motorized trail network in the Red Hill SMRA");

AR3055 ("[S]hould it ultimately be managed commensurate with the Red Hill SRMA, it would

provide an opportunity to complement and enhance the recreation associated with the adjoining

Red Hill SRMA."); AR3058 (noting Sutey Parcel "adjacent to highly popular recreation areas

used by the community").  Essentially, BLM recognized that Red Hill receives extensive

recreational use—and consequently has been difficult to manage due to BLM's limited

resources[13]—and Sutey Ranch would help alleviate some of that pressure.

Sutey Ranch also provides habitat for deer and elk. AR3104 (BLM describes Sutey

Ranch as "contain[ing] important habitat for both American elk and mule deer.").  When

commenting on the Land Exchange, Colorado Parks and Wildlife informed BLM that the Sutey

Ranch contains "important big game winter range and production areas for elk during calving."

AR603; AR2309 (Garfield County's comments also explaining Sutey Ranch's significance to

wildlife); AR629 (comment noting "the ranch offers important and critical wildlife habitat for

deer and elk" and "linkage [the ranch provides] benefits wildlife by providing a movement

corridor"); AR3104 (Environmental Assessment stating "Sutey Ranch contains important habitat

for both American elk and mule deer"). *See also* AR604 ("Sutey Ranch should be utilized for the

benefit of wildlife and wildlife habitat").

However, although the Land Exchange was intended to provide new public space for

recreation, akin to the activities that take place on Red Hill, BLM's Environmental Assessment

does not evaluate or disclose the impact of recreation on wildlife.  BLM says the management

---

[13]     For this reason, the Wexners agreed to provide BLM with $1,100,000 to develop and
implement a management plan as part of the Land Exchange. AR3015. *See* AR3057 ("The $1.1
million dollar donation included in the Proposed Action would offset the costs of developing a
site-specific management plan for the Non-Federal Parcels as well as for the costs of their long-
term management."); AR3065 ("The concept behind the $1 million donation is to provide a
permanent endowment for management of the Non-Federal Parcels into the future.").

plan for the 1999 Red Hill SMRA provides a "justifiable template" for how Sutey Ranch will be
managed, AR3015, which means "manag[ing] for the activities of day-use walking, hiking,
running, horseback riding and mountain biking on designated route." AR3610; AR3026 (BLM
manages Red Hill "to allow for recreation, primarily biking, hiking and horseback riding"). *See*
AR3057 (EA recognizing Land Exchange will result in "additional recreation and human
presence" on Sutey Ranch).  But recreation will harm Sutey Ranch wildlife.  Colorado Parks &
Wildlife recommended to BLM "that the Sutey Ranch *not* be managed under the Red Hill
Special Recreational Management Plan" because it accommodates recreation at the expense of
wildlife. AR604 (emphasis added).  The state agency further explained that "[r]ecreation
pressures continue to increase on public lands both in user numbers and periods of use. Winter
recreation on deer and elk winter range increases stress levels and can force animals into less
suitable habitat, diminishing herd health." AR604 (recommending closing Sutey Ranch "from
December 1 through May 15 to protect wintering wildlife"). *See also* AR2310 (Garfield County
supporting "seasonal or other closers of all or portions of the [Sutey] parcel to public use as may
be determined to be appropriate in the planning process to protect wildlife and plant
communities").  Although BLM knew of such impacts, the agency did not analyze them in the
Environmental Assessment for the Land Exchange.  BLM's failure to do so violates NEPA's
mandates to publicly disclose and take a "hard look" at these environmental impacts. *See Kern v.
BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002) (concluding agencies cannot "shirk their
responsibility under NEPA by labeling any and all discussion of future environmental effects as
'crystal ball inquiry'").

  In addition to its failure to analyze impacts from Sutey Ranch recreation on wildlife,
BLM's insignificance conclusion as it pertains to this issue lacks support.  BLM fails to detail

how these adverse impacts—as detailed by Colorado Parks & Wildlife and Garfield County—will be reduced or minimized.  The forthcoming Sutey Ranch management plan, developed with money ($100,000) donated by the Wexners and modeled after the 1999 Red Hill SMRA management plan (AR3015, 3055), cannot support BLM's FONSI.  That Sutey Ranch plan does not exist. *See Klein*, 747 F.Supp.2d at 1259 (finding FONSI unsupported where "there were no detailed mitigation plans upon which OSM could have relied").  And though it may serve as a model, the Red Hill plan lacks measures addressing recreational impacts to wildlife, *see* AR3605-23, and was called out by Colorado Parks and Wildlife as deficient for this reason.  AR604 (recommending "that the Sutey Ranch *not* be managed under the Red Hill Special Recreational Management Plan").

In sum, BLM's analysis of recreation activities on Sutey Ranch resources does not comport with NEPA's "hard look" requirement and its insignificant-impact conclusion is without factual support in the record.  Accordingly, the EA/FONSI should be vacated and set aside.

C.      BLM did not comply with notice and comment procedures.

Public participation in an agency's decisionmaking process is fundamental to NEPA's purpose. *Marsh*, 490 U.S. at 371; *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989) (NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision"); 40 C.F.R. § 1500.1(b) ("public scrutiny [is] essential to implementing NEPA"); *id*.§ 1506.6 ("Agencies shall: (a) [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."). *Accord* 43 U.S.C. § 1702 (FLPMA's definition of "public involvement" ensures agencies implement procedures "as may be necessary to provide public comment in particular instances").  For the Land Exchange, because BLM determined that

public notice and comment was both practicable and appropriate, *see* 43 C.F.R. § 46.305(a), § 46.305(b), the agency released the draft Environmental Assessment and held a 30-day public comment period. AR2434-38 (explaining BLM conducted notice and comment "because of the high interest in this proposal and our desire to be as transparent as possible"); AR1943 ("We want to hear any issues or concerns from the public, particularly specific to the analysis in the EA.").

But public participation in a NEPA process is beneficial only to the extent the public has meaningful information on which to comment and there is agency transparency. *Marsh*, 490 U.S. at 371 ("NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time"); *New Mexico*, 565 F.3d at 703 ("By focusing both agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decisionmaking by agencies and allows the political process to check those decisions."). *See Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Engineers*, 524 F.3d 938, 953 (9th Cir. 2008) ("An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process.").  Here, BLM withheld from Colorado Wild Public Lands and the public two important aspects of the Land Exchange: the appraisals prepared for each piece of property and the agency's decision to eliminate a sizeable portion of Sutey Ranch from the Exchange.

1.    BLM withheld the appraisals.

BLM must complete appraisals for properties involved in a land exchange to ensure that public lands are assessed at market value and the value of the properties are equal. 43 U.S.C. §§ 1701(a)(9), 1716(b) & (d).  A BLM press release states that the Environmental Assessment

"includes a detailed analysis of the environmental and economic aspects of this proposal," AR1943, and the draft Environmental Assessment reveals that "[t]he appraisals are contained in the administrative record," AR1959.

Yet BLM withheld the appraisals from the public at a time when they could have been reviewed and commented upon. *See Marsh*, 490 U.S. at 371 ("NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time"). BLM certainly could have released them—the appraisals were completed in November 2012, months before BLM released the draft environmental assessment for comment on April 29, 2013.  BLM reviewed the appraisals and approved them in January 2013, also before the EA was made available for public comment. AR2471, AR 2600, AR2678, AR2765.  Meanwhile, the Wexners and their representatives helped prepare and review the appraisals. AR2473, 2474; AR2602, 2603; AR2680, 2681.  This is not a case where the appraisals were prepared after the comment period closed. *See Great Basin Resource Watch v. B.L.M.*, 844 F.3d 1095, 1104 (9th Cir. 2016) (finding post-environmental impact statement analysis was insufficient, in part, because "public never had opportunity to comment…, frustrating NEPA's goal of allowing the public the opportunity to play a role in ... the decisionmaking process") (internal quotation omitted).

BLM went the extra mile to keep the appraisals from the public.  Immediately after the comment period opened on April 29, 2013, members of Colorado Wild Public Lands submitted a request on May 3, 2013 for the appraisal documents through the Freedom of Information Act (FOIA). Rickenbaugh Decl. ¶ 15.  Even though the documents requested were readily available and shared freely with the Wexners, BLM's steadfast refusal to release the appraisals forced an administrative appeal on July 26, 2013 and a lawsuit on December 9, 2013. *Id*. See *Rickenbaugh*

*v. U.S. Dept. of Interior*, Case No. 13-cv-3341l.  In January 2014, BLM released the appraisals to settle the lawsuit, but not in time for Plaintiff to comment on them, as the comment period had ended on May 29, 2013. Rickenbaugh Decl. ¶ 15.

Because BLM unnecessarily withheld the appraisals from public review, Plaintiffs were hamstrung in their ability to review and comment on the Land Exchange's "economic aspects," AR1943, and BLM's compliance with FLPMA's mandates. *See* 40 C.F.R. § 1508.27(b)(10) (NEPA's significance factors include "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment").  BLM violated NEPA's public disclosure and participation requirements, thwarting one of NEPA's primary purposes.

> ## 2. BLM reconfigured the amount of Sutey Ranch acreage included in the Land Exchange after the comment period, precluding public participation.

In addition to requiring that the properties exchanged be equal in value, 43 U.S.C. § 1716(b), FLPMA mandates that the proposed land exchange is in the public interest, *id*. § 1716(a). *See Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1180 n.8 (9th Cir. 2000).  BLM must issue a determination demonstrating that "the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired." 43 U.S.C. § 1716(b); 43 C.F.R. § 2201.7 (land exchange decision to be informed by "determin[ation] if a proposed exchange is in the public interest").  BLM must consider "Federal land management" and "the needs of State and local people, including needs for lands for the

economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife." 43 C.F.R. § 2201.7.[14]

After the Land Exchange's public comment period closed on May 29, 2013, BLM changed the acreage involved in the Land Exchange.  BLM removed 235 acres of Sutey Ranch's 557 acres, AR3286 (map), in order to satisfy FLPMA's equal-value requirement. AR2461 ("Because of differences in combined value for the two sides of the exchange, one of the non-federal parcels or private parcels, the Sutey Ranch…, has been proposed to be divided…"); AR2465; AR3290; AR3292-93. *See also* 43 C.F.R. § 2201.6(a)(1) (authorizing reducing size of parcels involved in land exchanges to achieve equal value).  The excised portion was donated to BLM instead. AR2440. *See* 43 U.S.C. § 1715(a) (authorizing land donations).

When commenting of BLM's Environmental Assessment, the public believed that the Land Exchange included all of Sutey Ranch. AR1955.  But because BLM changed the configuration of the Land Exchange after the comment period, Plaintiff could not address whether the public lands (*e.g.*, the Sopris Parcel) had more value than the private lands after BLM removed 235 acres from Sutey Ranch.  BLM prevented Plaintiff from commenting on whether the Land Exchange satisfied FLPMA's public-interest requirement. *See* 40 C.F.R. § 1508.27(b)(10) (significance finding depends on "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.").

Notably, like the appraisals, BLM could have sought public input on its reformation of the Land Exchange.  The need to equalize the value of the exchanged properties was known long before the draft Environmental Assessment was prepared and released in April 2013.  BLM's appraisals found the market values unbalanced in November 2012 and that none of the tools

---

[14]     These FLPMA issues are discussed in more detail below.

available for equalization—*e.g.*, waiver or equalization payment—was available. *See* AR2440 ("Based on the appraisals prepared for [BLM], it is our understanding that the combined value of the Non-Federal Parcels [] exceeds the value of the six Federal Parcels.").

BLM compounded its NEPA violation by not tailoring its public-interest determination to the resource values found on Sutey Ranch's remaining 322 acres. *See* AR2969-70.  For example, when expressing his approval, the BLM Director represented that the "[a]cquisition of the non-Federal lands will," among other things, "[e]liminate the threat of development of the non-Federal lands into a planned subdivision of 278 buildable lots." AR3307.  But the potential for 278 lots assumes a subdivision over the entire 557-acre Sutey Ranch. AR2970 (explaining Sutey Ranch's prior owner could "legally subdivide the ranch into as many as 278 buildable lots"). And elsewhere, it is plain that BLM's finding was predicated on the entire 557 acres of Sutey Ranch. *See* AR2969 ("Through the EA we determined that the exchange and donation …would better support local economies, community growth and expansions goals of the three counties."); AR2970 ("I have determined that approval of the land exchange and acceptance of the donation of a portion of the Sutey Ranch will well serve the public interest."); AR3323 (claiming "the exchange and donation will increase land management efficiency"); AR3438 ("The loss of limited resources values present on the federal lands [*ex.* the Sopris Parcel] is more than offset by the acquisition of the non-federal lands [*ex.* Sutey Ranch].").  Nowhere did BLM articulate the values specific to the portion of Sutey Ranch (sometimes referred to as Parcel 1A) that the agency ultimately included in the Land Exchange.  Consequently, there was no opportunity for the public to comment on BLM's overstatement of the Land Exchange's public benefits.

III.    **BLM violated the Federal Land Policy and Management Act**

A.      FLPMA and implementing regulations

FLPMA authorizes BLM to approve land exchanges if certain conditions are met. 43 U.S.C. § 1716(a), § 1715(a).  One condition ensures the United States is getting a fair deal. BLM thus must assess the properties' "fair market value," *id*. § 1701(a)(9), and ensure that the lands being exchanged are "equal value." *Id*. § 1716(b).[15]

To do this, BLM prepares appraisals for the properties involved. 43 U.S.C. § 1716(d)(1). Appraisals are guided by BLM regulations, BLM's handbook, the Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA) and the Uniform Standards of Professional Appraisal Practice (USPAP). 43 C.F.R. § 2201.3.  "Market value" is determined based on the property's "highest and best use." *Id*. § 2201.3-2.[16]  Highest-and-best-use is defined as "the *most probable legal use of a property*, based on market evidence as of the date of valuation, expressed in an appraiser's supported opinion." *Id*. § 2200.0–5(k) (emphasis added).  Further, in determining market value, the appraiser is to value the property "as if in private ownership and available for sale in the open market." 43 C.F.R. § 2201.3–2(a)(2).

FLPMA's second condition requires BLM to evaluate whether the land exchange is in the "public interest," with a focus on the public lands being traded away. 43 U.S.C. § 1701(a)(1) (BLM must "determine[] that *disposal* of a particular parcel will serve the national interest") (emphasis added).  A public-interest determination requires BLM to demonstrate that the

---

[15]     Differences in value can be rectified by a cash payment, if the difference in value is no more than twenty-five percent, or a waiver, provided the difference in value is no more than three percent. 43 U.S.C. § 1716(b).

[16]     FLPMA regulations define "market value" as "the most probable price in cash, or terms equivalent to cash, that lands or interests in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeably, and the price is not affected by undue influence." *Id*. § 2200.0–5(n).

proposed land exchange is better for the public than keeping the public lands under BLM management. *Id*. § 1716(a) ("[T]he values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership *are not more* than the values of the non-Federal lands or interests and the public objectives they could serve if acquired.") (emphasis added).  BLM must consider factors such as whether the exchange will result in "better Federal land management" and assess public needs, such as "the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife." *Id*.  Support for a public-interest determination must be included in the administrative record. 43 C.F.R. § 2200.0-6(b).

B.   <u>BLM's market value determination for the Sopris Parcel unlawfully undervalues this federal property.</u>

BLM determined that the market value of the Sopris Parcel is $3,100,000, which is based on the parcel's 1,240 acres and a price-per-acre of $2,500. AR2744.[17] Here, BLM committed legal error in significantly undervaluing the Sopris Parcel.

1.   <u>The highest and best use of the Sopris Parcel includes vehicle access.</u>

BLM's market value determination for the Sopris Parcel failed to comply with appraisal standards.  The appraisal discounts the Sopris Parcel's value versus comparable sales based on the assumption that vehicle access is lacking.  In doing so, BLM ignored the known future use of the Sopris Parcel—assemblage with the Two Shoes Ranch and resulting vehicle access.

The foundation for determining market value is a property's "highest and best use," which can be and is often the future use of the property.  Under the Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA), highest and best use is defined as "the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the

---

[17]   The two other smaller federal parcels—Parcel B and Parcel B-1—were also valued at $2,500/acre. AR2744.

reasonably near future." Uniform Appraisal Standards for Federal Land Acquisitions at 22,

102.[18] *See Spanish Springs v. DOI*, 328 Fed. App. 365, 367 (9th Cir. 2009) ("Under the Uniform

Appraisal Standards for Federal Land Acquisitions, an appraiser must assess each *reasonably*

*probable future use* in terms of its physical possibility, legal permissibility, financial feasibility,

and its degree of profitability.") (emphasis added) (citations omitted).  The "highest and best use

of the land can be based upon reasonable future probability." *U.S. v. Benning*, 330 F.2d 527, 531

(9th Cir. 1964) ("The highest and best use is not found from the past history or present use of

these lands but from reasonable future probability in the light of the history of the region in

general.").  The Ninth Circuit, in admonishing BLM for ignoring a likely future use, reasoned

that "[t]he government must not wear blinders when it participates in a real estate transaction,

particularly if the result, as here, is the transfer of a flagrantly undervalued parcel of federal land

to a private party." *Bisson*, 231 F.3d at 1187.

The "reasonably probable" future use of the Sopris Parcel is its inclusion in the Wexners'

Two Shoes Ranch.  Indeed, from the beginning, this was the sole purpose of the Land Exchange.

AR881 ("The owners of the Two Shoes Ranch…have explored various options for completing a

land exchange with the Federal government to acquire certain parcels of Federal land."); AR883

("Two Shoes Ranch intends to consolidate the 1,240 acre [] parcel[] with its other adjoining

lands for more efficient ranch management."); AR2945 ("Under the Proposed Action…Parcel A

would be incorporated into the Two Shoes Ranch"); AR997 (noting Wexners contacted BLM to

enter into land exchange because Sopris Parcel "lies in the middle of their ranch").

---

[18]        Available at:
http://www.appraisalfoundation.org/imis/TAF/Standards/Appraisal_Standards/Uniform_Apprais
al_Standards_for_Federal_Land_Acquisitions/TAF/Yellow_Book.aspx?hkey=77e5c6a0-ff07-
4aa0-be1b-b7e0f0fa0360 (last visited June 4, 2018).

BLM's appraisal confirmed as much.  It determined that the Sopris Parcel's highest and best use is its future use, which is "agriculture and/or recreation due to the lack of vehicle access, *as well as assemblage with adjacent land (Two Shoes Ranch)*." AR2717 (emphasis added); AR2698 ("agriculture and/or recreation, as well as possible assemblage with adjacent private lands (Two Shoes Ranch is the only logical buyer)").  BLM's appraisal explained that "assemblage of the subject property with the surrounding private land is a viable option" because the Sopris Parcel "creates a 'land bridge' between the Upper and Lower Two Shoes Ranch," the Wexners "hold exclusive and renewable federal grazing permits on this tract of BLM land" and "control vehicle access to each of the Pitkin BLM Parcels (the Sopris Parcel)." AR2717.  The appraisal also notes that the Wexners are "the most logical buyer" so they "could maintain control over the entire holding in order to enhance [their] privacy and prohibit any development." AR2718.

Given this probable future use, the Sopris Parcel will have vehicle access just like all other portions of the Two Shoes Ranch.  The administrative record and the appraisal are unequivocal on this point.  The Wexners "can provide vehicular access to each subject parcel from private roads." AR2705; AR2682 ("The proponent can provide vehicle access to each subject parcel from private roads.").  "[E]ach parcel has seasonal vehicular access from private roads within Two Shoes Ranch" and "are controlled by the proponent [the Wexners]." AR2705. "[P]rivate roads that traverse [the Sopris Parcel] are controlled by the proponent." AR2698; AR2691 ("[P]rivate roadways that access the parcels are controlled by the proponent [the Wexners]"). *See also* AR655 (map depicting access via Thomas Road from running from west and traversing entire Sopris Parcel).

Despite this reasonably probable future use, BLM's appraisal unlawfully discounted the market value by claiming the Sopris Parcel lacks vehicle access. AR514 (stating Sopris Parcel "is landlocked and *currently* does not have any legal vehicle access") (emphasis added) (citing AR3660).  BLM contends elsewhere that future vehicle access is "speculative and conjectural." AR3660.  BLM's appraiser states that it relied on the agency's instructions that there is no vehicle access to the Sopris Parcel. AR2750 ("the six Federal parcels (including the Sopris Parcel) have physical access but do NOT have legal access") (citing, AR3422 (BLM's IVIS Appraisal Request Worksheet advises that there is no current access to Sopris Parcel)).  And so, when analyzing comparable sales to determine the Sopris Parcel's market value, the appraisal adjusts some sales downward and selects other properties that lack access. AR2698 ("only a few of these transactions are truly comparable and some required downward adjustments to account for declining market conditions since closing and/or superior access."); AR2720 ("[T]he subject [Sopris Parcel] was valued as one holding of vacant land that lacks adequate access and zoning/land use for rural residential development."); AR2720 ("Please note three sales had far superior aces and warranted a significant downward adjustments.").  In doing so, BLM violated FLPMA's standard for determining market value.

Courts have found appraisals invalid when they fail to determine market value based on the reasonably probable future use.  In *Bisson*, the land exchange involved conveying federal lands to a private entity for use as a landfill.  These BLM-administered lands had been used previously for mining. *Bisson*, 231 F.3d at 1175.  The appraisal valued the federal lands for mining or as open space or wildlife habitat, but not based on its intended future use as a landfill. *Id*. at 1180, 1182.  The court set aside the land exchange "because landfill use was reasonably probable" and "the appraisal report failed to consider market demand for this potential future

use." *Id.* at 1181-83.  The court reasoned that "the appraiser well knew that Gold Fields and the

BLM fully intended to utilize the land for the Mesquite Regional landfill and had taken

substantial steps to do so." *Id.* at 1182.  The court concluded as follows:

> The use of the land as a landfill was not only reasonable, it was the specific intent of the
> exchange that it be used for that purpose.  There is no principled reason why the BLM or
> any federal agency should remain willfully blind to the most elementary principles of real
> estate transactions.

*Id.* at 1184.  Several years later, the Ninth Circuit again found a BLM appraisal illegal because it

valued federal lands based on their prior use (a mine) and not the intended future use (a landfill).

*Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1067-69 (9th Cir. 2010).  Just as the

stated intent of these California land exchanges was to use the federal property for landfills, the

intended use of the Sopris Parcel is for the Wexners to have one contiguous ranch, complete with

vehicle access throughout.

It is notable that had the appraisal valued the Sopris Parcel as having vehicle access, the

market value would have been far greater than $2,500 per acre and the Land Exchange would not

have satisfied FLPMA's equal-value requirement.  The Sopris Parcel appraisal was based on six

comparable sales. AR2721-2744.  Sales 1-3 had vehicle access.  But based on the flawed premise

that the Sopris Parcel lacked vehicle access, they were adjusted downward by 50-75 percent:

> - Sale 1 sold for $11,262 per acre, but the appraisal applied "a negative adjustment of
> 75% for access results," and thus was reduced to "$2,816 per acre."
>
> - Sale 2's market value was reduced by 50% due to vehicle access, resulting in a
> downward adjustment from $9,107 per acre to a $4,554 per acre; and,
>
> - Sale 3 was similarly reduced; its per acre value of $8,571 was reduced by 65% to
> account for vehicle access, resulting in a $3,000 per acre value.

AR2738-39, AR2742; *see id.* at AR2698 (conceding comparable sales "required downward

adjustment to account for … superior access").  The Sopris Parcel's market value would have

been $9,646 per acre had BLM used Sales 1-3's actual values—rather than $2,500 per acre—or a total of $11,961,040 versus $3,100,000.

The appraisal's use of Sales 4-6 was also flawed. The appraisal found that these three properties *lacked* vehicle access and were thus comparable to the Sopris Parcel. AR2743 ("[Sale 4] lacked legal or physical access from any public roadway"); *id*. ("[Sale 5] only has seasonal vehicle access from jeep trails that cross the [adjacent] BLM tract"); *id*. ("[Sale 6 has] seasonal vehicle access only from County Road 121 via jeep trails that cross intervening public land").[19] However, because the Sopris Parcel will not lack access, the appraisal should have dismissed Sales 4-6 as comparable sales entirely, or their sale values should have been adjusted upwards. As is, however, these properties are not comparable because they lack access.

Accordingly, BLM's conclusion about the Sopris Parcel's market value is "not in accordance with" FLPMA's high-and-best-use standard and also "runs counter to the evidence before the agency," *Colo. Envt'l Coal.*, 185 F.3d at 1167, as record shows that combining the Sopris Parcel with the Wexners' Two Shoes Ranch was neither speculative nor conjectural.

### 2.   The appraisal failed to consider relevant comparable sales.

The Wexners began assembling property in the Roaring Fork Valley for a private ranch estate in 2002. In separate transactions, the Wexners purchased two properties—the "Bane Tracts" and "Crystal Island Ranch"—for their Two Shoes Ranch. AR374, ¶¶ 4-6. These two properties totaling 4,041 acres were acquired for $65,000,000, at an average purchase price of $16,085/acre. *Id*. Shortly after, the Wexners strategically purchased other properties to enlarge their Two Shoes Ranch through a land exchange. They bought the majority (520 acres) of Sutey Ranch for $6,500,000 in 2008, which calculates to $12,501 per-acre, AR355, AR370, and

---

[19]   Sales 4-6 were valued at $1,879, $2,133 and $2,331 respectively. AR2743.

remaining the 37 acres (containing the Sutey homestead) in 2010 at a per-acre-price of $9,054. AR370.  The Wexners purchased the 112-acre West Crown property in 2010 for $1,950,000, or $13,929/acre. AR2639; AR2727.  In contrast, BLM's 2012 appraisal valued the 1,240-acre Sopris Parcel at only $2,500 per acre, significantly less than the parcels the Wexners purchased in the area.

The Sopris Parcel appraisal was arbitrary in its omission of comparable sales.  First, it failed to include the Wexners' prior acquisition of the two properties that make up the Two Shoes Ranch. *See* AR2721 (listing all sales considered, including those relied upon for appraisal).  The Sopris Parcel's market value is far below—more than six times below—what the Wexners paid to establish their Two Shoes Ranch estate.  The Sopris Parcel appraisal and BLM's approval of the appraisal, AR2678-85, are silent as to why these earlier sales were omitted from the comparable sales, even though the Bane Tracts and Crystal Island Ranch surround the Sopris Parcel and also involved the Wexners as buyers.  For this reason alone, BLM's appraisal for the Sopris Parcel was arbitrary, as it failed to consider relevant factors—the Bane Tracts and Crystal Island Ranch—or even explain this omission. *See Olenhouse*, 42 F.3d at 1574-75.

The IBLA accepted the agency's *post hoc* explanations for why the appraisal could ignore the Wexners' acquisition of the Two Shoes Ranch: they involved larger parcels and came with vehicle access, improvements, water rights, and development rights. AR721.  But these rationales do not explain the omission of the Wexners' prior acquisitions.  A parcel's size is irrelevant because market value is determined on a per-acre basis.  And, in any case, the Sopris Parcel's 1,240 acres is comparable in size to the 1,560-acre Crystal Island Ranch. AR374.  The Sopris Parcel's future use—assemblage with the Two Shoes Ranch—eliminates any problems concerning vehicle access, as detailed above, and water rights.  Property improvements did not

contribute to the value of either of Two Shoes Ranch acquisitions—the Bane Tracts were vacant land, AR374, ¶ 4, and the Wexners immediately demolished the residence on the Crystal Island Ranch, AR 375, ¶¶ 8-9.

Lastly, development rights do not support the offered distinction.  For each of the parcels, Pitkin County zoning rules and the Growth Management Quota System (GMQS) apply.  Under these rules and their restrictions, the prior owners of both the Bane Tracts and Crystal Island Ranch had applied for and received 20-year vested residential development rights for very large homes. AR376, ¶ 10.  The contention that the Sopris Parcel would be disadvantaged under these rules because it was federal property is not relevant. AR721. *See* AR2702 (Sopris Parcel "is federally owned and thus not eligible for residential exemptions to the Growth Management Quota System").  Under BLM's instructions and FLPMA regulations, the appraiser could not view the Sopris Parcel as federal property and instead was required to "assume[] that the property is in private ownership [and] zoned consistent with similar non-Federal property in the area (*i.e.*, the current zoning of RS-30 by Pitkin County)." AR2680; AR376-77, ¶¶ 11-13 ("This misleading allegation also directly controverts the following 'instructed hypothetical condition.'"). *See* 43 C.F.R. § 2201.3-2(a)(2) (requirement under BLM regulations to appraise land "as if in private ownership").[20]  In sum, BLM's argument that the Sopris Parcel is not like the 4,041-acre Two Shoes Ranch does not explain why transactions involving the Bane Tracts and Crystal Island Ranch were excluded from the appraisal.

In addition to ignoring the sales involving the Two Shoes Ranch, the Sopris Parcel appraisal also dismissed the Wexners' 2010 purchase of the West Crown parcel (at

---

[20]     The restrictions included in the conservation easements for both properties underscore that there were no differences in development potential.  The Two Shoes Ranch conservation easement included a prohibition on residential development. AR3562.  The same prohibition language is found in the Sopris Parcel conservation easement. AR1665.

$13,928/acre), while using a 2005 sale of this same property (at $8,571/acre). AR2727.  The explanation given is that the Wexners' 2010 transaction involved "a highly motivated buyer" and thus the price did not reflect market value. *Id*.  But the record does not support this reasoning. The 2010 sale for $1,950,000 was *below* the asking price. *Id*. ("the [West Crown] parcel was available [in 2010] for $3,000,000 through a local realtor").  Thus, even assuming the Wexners were motivated, they did not overpay.  Further, the 2010 West Crown sale price ($13,928/acre) was less than what the Wexners paid for the Two Shoes Ranch base properties ($16,085/acre), AR 374-75, ¶¶ 4-6, and comparable to what they paid for Sutey Ranch ($12,501 per-acre), AR355, AR370.  The Wexners' 2010 purchase was thus "typical of the market." *Cf.* AR 3361. Based on available record evidence, the 2010 sale of the West Crown property was at market value and BLM's failure to consider this transaction as a comparable sale was arbitrary.

C.    BLM's public-interest determination conflicts with record evidence.

FLPMA requires that BLM find that a proposed land exchange serves the public interest. 43 U.S.C. § 1716(a).  BLM cannot proceed with the Land Exchange if the acquired lands (Sutey Ranch) have less resource value than the lands being given away (Sopris Parcel). *Id*.  In three respects, BLM's public-interest determination for the Land Exchange was based on infirm findings.

First, BLM claims the Land Exchange is justified under section 1716(a) because the Sopris Parcel is too "difficult to manage" due to a lack of access. AR2969; AR3022 ("It is difficult to manage [due to] having no access.").  This narrative fills the administrative record. AR3292 (contending Sopris Parcel "difficult to manage"). *See also* AR3290; AR2970; AR2973; AR2998; AR842.

But the premise of this rational—that BLM lacks access—is wrong.  BLM secured access to the Sopris Parcel for the express purpose of managing public lands.  As set forth in a 1996 easement granted BLM by the owners of the Two Shoes Ranch: "Grantors also grant a non-exclusive easement to their access road from Prince Creek County Road to the point the road enters BLM land for use by BLM and the [Colorado] Division of Wildlife employees for use in emergencies or *management of public lands*." AR836 (emphasis added).  Indeed, BLM conducted several assessments of the Sopris Parcel, including for the purpose of evaluating the impact of livestock grazing on the Harrington's penstemon and riparian habitat. AR3515 ("The Thomas Allotment was assessed during the summer of 2010 as part of the Roaring Fork Land Health Assessment."); AR3531 (Stream status assessments in 1997 and 2010 reviewed whether creeks and riparian habitat on Sopris Parcel were in "Proper Function Condition").  Thus, BLM has had access to the Sopris Parcel since 1996, allowing the agency to manage the Sopris Parcel. To the extent BLM's public-interest determination was predicated on the Sopris Parcel being inaccessible and thus difficult to manage, record evidence does not support that conclusion.

Second, BLM's public-interest determination states "[t]he resource values of the non-Federal lands are greater than the resources values of the Federal lands." AR2969; AR2970 (stating comparative analysis also found in Environmental Assessment).  In offering this conclusion, the agency emphasizes the wildlife values found on the 557-acre Sutey Ranch. AR2969 ("The non-Federal lands contain valuable big game winter habitat and water rights allowing for the long-term protection and enhancement of natural resources.").

While Colorado Wild Public Lands acknowledges that Sutey Ranch provides valuable wildlife habitat, the record reveals that the wildlife values and water resources on the Sopris Parcel are greater.  For starters, the Sopris Parcel contains 1,240 acres of wildlife habitat, almost

four times more than the 322 acres on Sutey Ranch. *Compare* AR3103 (Sopris Parcel) *with*

AR3104 (Sutey Ranch).

Not only is the quantity of habitat far greater, but so too is the quality.  The Sopris Parcel

provides "outstanding and varied natural habitat," AR1660, for deer and elk as well as an

important population of bighorn sheep.

> Notably, the Potato Bill drainage and Lion's Mane [within the Sopris Parcel] provide
> critical habitat for the Mount Sopris bighorn sheep herd.

AR1661; AR3101 ("Rocky Mountain bighorn sheep are known to occur on" the Sopris Parcel);

AR3102 ("[I]mportant habitat for bighorn has been mapped on [the Sopris Parcel]"); AR3239

(map depicting bighorn sheep population and habitat in Lion's Mane).  There are no bighorn

sheep or sheep habitat on Sutey Ranch. AR3104 (depicting habitat for deer and elk only).  The

Sopris Parcel also provides "valuable …riparian habitat" due to the presence of Thomas Creek,

Potato Bill Creek and their tributaries, AR1661, and has 9,286 linear feet of aquatic habitat,

AR3120. *See* AR1602 (Sopris Parcel "contains the largest area of wetlands and riparian habitat"

compared to other parcels involving in Land Exchange).  Sutey Ranch lacks aquatic habitat.

AR3120.  The Sopris Parcel also has numerous populations of Harrington's penstemon,

AR3141-42, AR1601, whereas this wildflower does not exist on Sutey Ranch.  Further

highlighting its significance, "[t]he northern half of the [Sopris Parcel] is located within the

Crown Potential Conservation Area, designated by the Colorado Natural Heritage Program as a

conservation priority for its biodiversity rank of B2 (very high significance)." AR1661.

Notably, BLM's public-interest determination does not even mention the significant

wildlife and habitat values found on the Sopris Parcel, choosing instead to announce its

summary—and contrary-to-the-evidence—conclusion about the comparative benefits of the

Land Exchange.  In short, record evidence does not support BLM's claim that wildlife values are better on the Sutey Ranch.

Finally, as detailed above, BLM's public-interest determination was based on the entire 557 acres of Sutey Ranch.  But not all of Sutey Ranch was included in the Land Exchange. When BLM realized that the appraised value of the Wexners' properties was considerably more than the federal lands—and thus would violate FLPMA's equal-value requirement—the agency excised 235 acres from the Land Exchange.  BLM thus should have evaluated only the 322 acres of the Sutey Ranch parcel that was ultimately included in the Land Exchange.

Accordingly, BLM's determination that the Land Exchange is in the public interest—the public would receive more resource value from the Exchange—was arbitrary and capricious. *See Ctr. For Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d 633, 646-47 (9th Cir. 2010).

**IV.     The Court should award Plaintiffs their requested relief.**

As required by the APA and because BLM's decisionmaking was "arbitrary and capricious" and "not in accordance with law," the Land Exchange and BLM's flawed analysis and conclusions should be vacated and set aside. *See* 5 U.S.C. § 706(2) (courts "shall" "hold unlawful and set aside agency action"). *See F.C.C. v. NextWave Pers. Commc'ns*, 537 U.S. 293, 300 (2003); *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187-88 (10th Cir. 1999); *Se. Alaska Conservation Council v. U.S. Army Corps of Engineers*, 486 F.3d 638, 654 (9th Cir. 2007). Vacatur is the normal remedy for agency actions that fail to comply with NEPA and FLPMA. *High Country Citizens Alliance v. U.S. Forest Serv.*, 67 F.Supp.3d 1262, 1263 (D. Colo. 2014) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413-14 (1971).[21]

---

[21]     This Court should not depart from the APA's presumptive remedy.  However, some circuits, although not the Tenth Circuit, have applied a two-part test for avoiding vacatur.  But even under that test, the Land Exchange should be vacated because BLM's legal errors are

In this case, not only should the Land Exchange decision be vacated, but the property and financial transactions involved should be unwound. 5 U.S.C. § 702, § 703 (APA does not prohibit additional remedies). *See High Country Citizens Alliance*, 67 F.Supp.3d at 1263.  BLM and the Wexners ensured that the Land Exchange could be undone should Plaintiff succeed. AR749 ("Many months of discussions, planning and effort between BLM and the proponents were required to structure the complicated closing so that the parties could be restored to their original positions."); AR769 ("[T]he Wexners and the BLM began drafting the closing documents with respectful deference to the Court's Order…the closing documents were prepared to ensure that no eggs were scrambled and that the federal lands subject to the exchange could be returned without resource damage.").

## CONCLUSION

For the foregoing reasons, the Court should grant this Petition for Review, vacating and unwinding the Land Exchange.


Respectfully submitted,


Dated: June 7, 2018                  */s/ Neil Levine*
                                     Neil Levine (CO Bar No. 29083)
                                     Law Office
                                     4404 Alcott Street
                                     Denver, Colorado 80211
                                     (303)-455-0604
                                     nlevine@publicjustice.net

                                     *Attorney for Plaintiff*
                                     *Colorado Wild Public Lands*

---

significant and could lead to a different result, and because BLM and the Wexners planned for this eventuality, AR749, 769, vacating the Exchange will not cause a serious disruption, *see Nat'l Ski Areas Ass'n v. U.S. Forest Serv.*, 910 F. Supp. 2d 1269, 1286 (D. Colo. 2012).

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2018 I electronically transmitted this PLAINTIFF'S OPENING BRIEF IN SUPPORT OF PETITION FOR REVIEW to the Clerk's Office using the CM/ECF System for filing and service on all registered counsel.


<u>/s/ Neil Levine</u>
Neil Levine