**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger**

Civil Action No. 17-cv-01564-MSK

**COLORADO WILD PUBLIC LANDS, INC.,**

      **Plaintiffs,**

**v.**

**GREG SHOOP, acting Colorado State Director of the U.S. Bureau of Land Management.
RYAN ZINKE, Secretary of the Interior; and
U.S. BUREAU OF LAND MANAGEMENT,**

      **Defendants.**

**And**

**LESLIE WEXNER; and
ABIGAIL WEXNER,**

      **Defendants-Intervenors.**

---

## OPINION AND ORDER AFFIRMING AGENCY ACTION

---

**THIS MATTER** comes before the Court for resolution on the merits pursuant to the

administrative record (**# 24,** as supplemented **# 31, 37**), the Plaintiff's ("Colorado Wild")

opening brief (**# 38**), the Defendants' (collectively, "the BLM") response brief (**# 39**), the

Intervenors' ("the Wexners") response brief (**# 40**), and Colorado Wild's reply brief (**# 43**).

## FACTS

The Court summarizes the pertinent facts here and elaborates as necessary in its analysis.

The BLM is the owner of a parcel of federal land, known as the Sopris Parcel, located outside of

Carbondale, Colorado.  The Sopris Parcel is bracketed on the east and west by the Wexner's Two

Shoes Ranch.  Beginning in or about 2011, the Wexners entered into discussions with the BLM

about the possibility of a land exchange, allowing them to acquire the Sopris Parcel in exchange for conveying various other parcels they owned to the BLM.  Although several parcels (and various other considerations, some discussed herein) were involved in the negotiations, the primary focus of the swap involved the Wexners trading a parcel of land that they owned north of Carbondale, known as the Sutey Ranch. The Sutey Ranch parcel is adjacent to existing BLM land known as the Red Hill Area, a popular destination for outdoor recreational activities.  A second parcel owned by the Wexners, known as the West Crown Parcel, was also proposed as part of the swap, potentially increasing public access to a popular BLM parcel known as The Crown.

The BLM began an analysis of the proposal in May 2012, soliciting public comments on the proposed exchange.  Later that year, the BLM prepared appraisals of the value of each parcel because federal law requires that the lands exchanged have approximately equal values.  The appraisals valued the Sopris Parcel as much lower than the value of the parcels the Wexners tendered in exchange.  Through additional negotiations, the parties therefore agreed to reduce the size of the Sutey Ranch parcel to be exchanged (although the Wexners later agreed to make a gift of the excluded portions to the BLM).  In addition, the Wexners agreed to place a conservation easement over the Sopris Parcel, limiting its permissible uses in perpetuity and granting a local land trust the ability to enforce the terms of that easement.

In April 2013, the BLM issued a draft Environmental Assessment and Finding of No Significant Environmental Impact ("EA" and "FONSI") for the proposed exchange and solicited public comment.  As Colorado Wild notes, the BLM did not make the appraisals for each parcel available at that time and failed to release those appraisals until after the comment period closed. The BLM approved the swap on June 20, 2014.  Colorado Wild challenged the approval with the

Interior Board of Land Appeals ("IBLA").  On March 27, 2017, the IBLA affirmed the BLM's decision.[1]

Colorado Wild then commenced this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.* It contends that the BLM's decision to approve the swap violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Federal Lands Policy Management Act ("FLPMA"), 43 U.S.C. §1701.  Colorado Wild argues that the approval should be set aside for the following reasons: (i) the BLM violated NEPA because the EA and FONSI failed to adequately account for the environmental impact of livestock grazing on the Sopris Parcel and the effect that increased recreation on the Sutey Ranch Parcel would have on wildlife; (ii) that the BLM failed to provide for adequate notice and comment under NEPA because it failed to publicly disclose the appraisals for each parcel and because the post-appraisal modification to the size the Suety Ranch Parcel were performed without notice to or comment by the public; (iii) the BLM violated FLPMA because the appraisal of the Sopris Parcel improperly considered the lack of vehicle access and failed to account for the values of prior land purchases by the Wexners; and (iv) the record does not support the BLM's conclusion that the swap was consistent with the public interest.

---

[1]      In the interim, notwithstanding ongoing appeals and litigation, the BLM and the Wexners closed on the swap, albeit through mechanisms that make it possible to unwind the transfers if necessary.  For purposes of temporal grammar, the Court will use verb tenses in this Opinion as if the transfer has yet to be consummated.

## ANALYSIS

### A. Statutory background

#### 1. APA

The APA provides the mechanism by which courts are authorized to review final agency actions. Under the APA, the Court may set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary or capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency" or where the action "is so implausible that it could not be ascribed to a different in view or the product of agency expertise." *High Country Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1222 (10th Cir. 2020). The Court affords the agency's decisionmaking a presumption of validity and the burden is on the party challenging it to demonstrate that the decision is arbitrary and capricious. *Id.*

#### 2. NEPA

NEPA requires federal agencies to analyze environmental consequences before initiating actions that potentially affect the environment. The agency must first conduct an EA to determine whether the action is likely to "significantly affect the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the agency determines that the project will not have significant environmental effects, it may issue a FONSI. 40 C.F.R. § 1501.6. The agency must give the public notice of the EA and FONSI (and underlying documentation) and solicit information and comment from the public on the documents and proposed action before proceeding. *Id.*; 40 C.F.R. § 1506.6. But NEPA describes only procedural requirements; so long

as those requirements are followed, the Court does not concern itself with the wisdom of the agency's decisionmaking. *New Mexico ex. rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 704 (10th Cir. 2009). As the Supreme Court has stated, NEPA "prohibits uninformed – rather than unwise – agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). The touchstone of the Court's inquiry is whether the agency "took a hard look at information relevant to the decision," that is, whether the agency "did a careful job at fact gathering and otherwise supporting its position." *Richardson,*, 565 F.3d at 704.

3.  <u>FLPMA</u>

FLPMA requires the BLM to develop land use plans for public lands with the goal of improving resource conditions and avoiding undue degradation of the law. *Western Watersheds Project v. Bureau of Land Management*, 721 F.3d 1264, 1268 (10th Cir. 2013). FLPMA specifically contemplates "exchanges of public lands" for private ones, so long as the public interest will be well served by making that exchange." 43 U.S.C. § 1716(a). In doing so, the agency must find that "the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired." *Id.* The values of the federal parcels conveyed and the private parcels received by the government must be equal, subject to certain constraints. 43 U.S.C. § 1716(b). The valuation of parcels is subject to appraisal provisions set forth in 43 C.F.R. § 2201.3, as discussed more fully herein.

**B.  NEPA challenges**

Colorado Wild raises two main challenges to the BLM's decision to approve the exchange with the Wexners: (i) that the FONSI did not adequately consider the potential environmental effect that the swap would have on both the Sopris Parcel and the Sutey Ranch;

5

and (ii) that the BLM did not provide for adequate public comment because it failed to disclose the appraisals of the various parcels during the public comment period.

### 1. The EA and FONSI

Colorado Wild argues that the BLM's EA and FONSI failed to adequately consider the environmental impacts of the land swap in two major respects: (i) that it failed to account for the possibility that grazing operations by the Wexners on the Sopris Parcel would damage sensitive environmental resources found there; and (ii) that it failed to consider how increased recreational use of the Sutey Ranch parcel, when annexed to the popular Red Hill area, would adversely affect wildlife in that area.

### (a). The Sopris Parcel

#### (i). Background

Colorado Wild contends that the BLM failed to adequately consider two impacts that the exchange would have on the Sopris Parcel: (i) the effect that unrestricted grazing would have on Harrington's penstemon, a flowering plant found on the parcel; and (ii) the effect on riparian environments found within the parcel, most notably an area along Thomas Creek.  To fully address these arguments, the Court must take a detour through certain BLM determinations regarding portions of the Sopris Parcel that predate the proposed land exchange.

The BLM assesses the health of public lands according to a series of Public Land Health Standards.  Of those, two are relevant here.  Standard 2 requires that "riparian systems associated with both running and standing water function properly and have the ability to recover from major disturbance such as fire, severe grazing, or 100-year floods."  Standard 4 requires that "special status, threatened, and endangered species . . . and their habitats are maintained or enhanced by sustaining healthy native plant and animal communities."  AR 3023.

The Sopris Parcel has historically been leased by the BLM for livestock grazing.  In 2012, when it came time to renew the grazing permit for a portion of the Sopris Parcel along Thomas Creek, known as the Thomas Allotment, the BLM prepared an EA for the decision as to whether to re-lease the land for grazing (and under what conditions).  In the 2012 EA, the BLM determined that "land health standards are not being met on the allotment."  AR 3514.  More specifically, the BLM found based on a 2010 assessment that "the Thomas Allotment was not meeting Standard 2 for riparian systems."  The BLM found that Thomas Creek, which flowed through the allotment, was "too wide and shallow in areas, . . . the riparian zone was not widening, riparian vegetative cover was insufficient to protect streambanks during high flow events, and riparian vegetation had poor vigor."  The 2012 EA stated that "livestock grazing was considered a significant factor in the failure to meet the standard."  AR 3515.

The 2012 EA also addressed Harrington's penstemon, a flowering plant that the BLM has identified as a "sensitive" species.  Harrington's penstemon grows extensively on the Sopris Parcel.  The 2012 EA found that "the flowering stalks of Harrington's penstemon are highly palatable to livestock and wildlife" and a land survey had noted that "nearly all of the flowering stalks had been bitten off in the more heavily grazed areas of the allotment."  The BLM noted that "heavy grazing during the flowering season could cause reductions in Harrington's penstemon populations if grazing removes a high percentage of the flower stalks annually, thereby inhibiting seed dissemination and reproduction."  AR 3522.  The BLM determined that a reduction in the number and scheduling of permitted grazing days would "reduc[e] the use [of the parcel] during the flowering period," and that, as a result, "penstemon populations would be maintained or improved."  At the same time, the EA did not make clear findings that penstemon populations were actually (or even potentially) at risk.  The EA cited to a land health assessment

conducted in 2010-11, in which "the interdisciplinary team did not identify any issues with

Harrington's penstemon" at the time, although it noted that "the assessment team only visited

one upland site in the Thomas Allotment."  But the 2012 EA also suggested that "shortening the

summer grazing period and reducing overall grazing use would result in less grazing of

Harrington's penstemon flower stalks which should endure adequate reproduction and seed

dissemination to maintain populations.."  AR 3523 (emphasis added).  Thus, it is somewhat

unclear whether the 2012 EA found that Harrington's penstemon populations were adversely

impacted by existing grazing practices (such that grazing restrictions were necessary to "ensure

adequate reproduction and . . . to maintain populations") under Standard 4 or whether penstemon

populations were fine (with no "issues" identified) under the existing grazing regulations.

      Ultimately, the BLM decided in 2012 to renew the grazing permits, subject to substantial

reductions in the amount of grazing that would be allowed.  Under the new grazing lease, Animal

Unit Months ("AUMs") would be reduced from the 80 to 49, and the number of permitted

grazing days would be reduced from 56 to only 14, effectively reducing existing grazing by

roughly 40-80%.  AR 3512.  In addition, the BLM directed that the grazing lessee construct

additional stock ponds to "help improve grazing distribution," moving livestock away from

riparian areas.  AR 3511.  The 2012 EA summarily rejected a "no action alternative" of

continuing grazing according to the practices that had been in existence to date, noting that

"reissuing the permit/lease without the new stipulations and proposed range improvements

would not be consistent with the Standard for Public Land Health," as the BLM had determined

that "land health standards are not being met on the allotment."  AR 3514.

      The decision-making process for the grazing permit renewals in 2012 substantially

influenced the BLM's 2014 EA regarding the proposed land exchange.  When conducting the

2014 EA for the proposed land exchange with the Wexners, it does not appear that the BLM undertook substantial new surveys nor analyzed whether the 2012 grazing restrictions had been efficacious.[2]  For example, in the final 2014 EA, the BLM notes that "portions of the riparian/wetland habitats as well as the channel morphology" in the Thomas Allotment "have been impacted by cattle grazing" and irrigation use.  The EA mentions that "a new grazing system was implemented for the Thomas Allotment," but it makes no findings as to whether that system was effective (or even complied with).  Instead, the EA simply speculated that "this new grazing system should benefit the riparian/wetland habitat along Thomas Creek by increasing total vegetation cover, and hopefully it will allow recovery of the native riparian and wetland vegetation."  AR 3169-70.  Again, relying entirely on the 2012 assessment, the 2014 EA repeated that the Thomas Allotment "was found not to be meeting Standard 2" due to grazing impacts, but that "changes to the livestock grazing system . . . are [ ] actions designed to move the allotment towards meeting Standard 2."  AR 3186.

Similarly, the 2014 EA does not appear to contain any new analysis or findings relating to Harrington's penstemon.  Instead, the 2014 EA refers back to the fact that the BLM "evaluated Standard 4 for Harrington's penstemon populations on [the Sopris Parcel] as part of the Environmental Assessment for the Thomas Allotment grazing permit renewal" in 2012.  The BLM noted that "[a]t the time the grazing permit renewal was being evaluated, a new grazing system was being proposed to improve land health conditions for the riparian areas."  The 2014 EA understood that the 2012 EA opined that "if this system is implemented, conditions for Harrington's penstemon also would likely be improved and would trend toward meeting

---

[2]      The 2014 EA indicates that "field reconnaissance on the exchange parcels was conducted in June and August 2011," apparently in conjunction with the grazing permit renewal.  EA 3168.

Standard 4 in areas where the standard is not currently being met." AR 3146 (emphasis added). Once again, the BLM's 2014 EA is somewhat unclear as to whether the Sopris Parcel was indeed in compliance with Standard 4 at that time.

The Court pauses here to express some concern regarding the BLM relying heavily on the 2012 grazing permit EA in order to inform its decisionmaking about the proposed land exchange in 2014. The Court is mindful of the fact that land surveys and analyses are difficult, expensive, and time consuming, and that ordinarily, conservation of agency resources might justify relying on prior assessments rather than beginning anew for each contemplated agency decision. At the same time, reliance on past findings is problematic when that reliance reposes extreme confidence in rehabilitative measures that post-date the previous assessment. Throughout the 2014 EA, the BLM repeatedly places faith in the ability of the "new grazing system" of 2012 to bring the Thomas Allotment into compliance with Standard 2 and to protect damaged penstemon populations (whether they were following Standard 4 or not). Admittedly, the two years that passed between the imposition of the 2012 grazing restrictions and the completion of the land exchange EA in 2014 might not provide enough time to meaningfully assess whether the new grazing system was effective or not, but the BLM does not ever state as much in the EA.

More importantly, the record makes clear that the BLM determined in 2012 that aggressive limitations on existing grazing would be necessary to negate the adverse impacts that grazing was having on riparian areas and penstemon populations on the Sopris Parcel. In 2014, the BLM recognized that effectuating the proposed land exchange with the Wexners would result in the cancellation of the federal grazing permits – and their corresponding restrictions designed to protect riparian areas and penstemon – and that future grazing on the Sopris Parcel would be subject only to limitations that the Wexners might choose to impose. AR 3080. Put differently,

the completion of the land exchange would not only abrogate the new grazing restrictions that had been imposed on the Thomas Allotment by the BLM in 2012 in order to protect riparian areas and penstemon populations, it would abrogate all grazing restrictions on the Sopris Parcel. Thus, it seems fairly obvious that approval of the land exchange would carry the very real possibility that the Wexners, free from the constraints of the 2012 (or any) grazing limitations, might instead choose to permit more frequent grazing on the Sopris Parcel, increasing the risk to riparian areas and penstemon populations found there. But the 2014 EA does not follow that reasoning to its end point, carefully avoiding making any findings about those increased risks.

Instead, the 2014 EA offers two explanations as to why those risks were insignificant to the proposed land exchange. First, it opines that if the land exchange were completed, the Sopris Parcel and the existing adjacent portions of the Two Shoes Ranch would now be "all under the same ownership," which "would enable greater flexibility to implement rotational grazing as well as for potential changes in fence alignment that would improve livestock distribution and reduce areas of overutilization." AP 3150. Although reduced grazing in riparian and penstemon habitats might be one possible outcome of the exchange, the BLM points to nothing in its assessment that suggests that this was a likely outcome, or the most likely outcome. The Wexners might require (or engage in) more flexible grazing schedules and build more fences to provide for more distributed grazing. Or they might not, and instead allow vastly more grazing on the Sopris Parcel which would increasingly harm the penstemon. The record does not reflect any promises by the Wexners in this regard or any other evidence that justifies the BLM's assumptions. Thus, the Court cannot find that the record supports a conclusion that hypothetical "rotational grazing" and "improve[d] livestock distribution" by the Wexners would eliminate the apparent risk that the proposed exchange posed to penstemon habitat and riparian areas.

The EA's second justification for finding that the swap would not likely impact riparian areas or penstemon populations resulting from the exchange turns on the fact that the Wexners had agreed that "conservation easements would be established" on the Sopris Parcel (among others).  The EA explained that such easements, granted in favor of and thus enforceable by local land trusts, "would extinguish the [Wexners'] development rights on the parcels and restrict the improvements allowed."  AR 3014.  The EA discusses the terms of the conservation easements in general, noting that they promise that the Wexners will "preserve and protect Conservation Values" of  the parcel, defined generally as "natural, scenic, open space, agricultural, and wildlife values . . . that are worth of preservation."[3]  AR 3014, 3255.  At the same time, the EA acknowledges that under the easements, "livestock grazing would be allowed to continue," subject to "the development of a grazing management plan" prepared by an external source and approved by the easement's grantee and Colorado Parks and Wildlife Division.  AR 3014.  Although it appears to be undisputed that the easements had been in place since October 2011, the EA makes no reference to whether the grazing plan contemplated by the easements had been developed nor whether the BLM had analyzed that plan for its effectiveness.

(ii).  Analysis

An agency may issue a FONSI for a proposed action by deciding, based on substantial evidence in the record, that the contemplated action will not result in substantial impacts.  Or the agency or it may conclude that substantial impacts might result from the action, but that "safeguards in the project sufficiently reduce [contemplated] impact[s] to a minimum." *Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156,

---

[3]     More specifically, the easement covering the portion of the Sopris Parcel containing the Thomas Allotment states that the Wexners will not "impair the relatively natural habitat for native plants (including Harrington penstemon habitat) . . ." except as otherwise permitted.

1172 (10th Cir. 2012). Where agencies rely on mitigation measures to minimize environmental impacts, their discussion of the possible mitigation measures must be "reasonably complete" in order to properly evaluate the severity of possible adverse effects. Agencies may not merely list possible mitigation measures. *Colorado Environmental Coalition v. Dombeck,* 185 F.3d 1162, 1173 (10th Cir. 1999).

Colorado Wild argues that the BLM failed to adequately consider the adverse environmental effects that lifting the 2012 (and indeed, all) grazing restrictions would have on riparian areas and penstemon habitat in the Sopris Parcel accompanying the proposed land exchange. The BLM offers several responses. First, the BLM argues that this Court should not consider any arguments relating to risks to the riparian areas of the Thomas Allotment because Colorado Wild did not raise riparian issues in its appeal to the IBLA. Even if Colorado Wild failed to present that issue to the IBLA, this Court nevertheless retains the discretion to consider it. *See Maralex Resources, Inc. v. Barnhardt*, 913 F.3d 1189, 1197 (10th Cir. 2019). Concerns with regard to riparian areas go hand-in-hand with those relating to Harrington's penstemon[4] (that the BLM concedes Colorado Wild exhausted before the IBLA) because they relate to overgrazing. The record on both issues is similar and fully-developed. Thus, this Court finds it appropriate to consider the two issues jointly.

Second, the BLM argues that it was not required to substantially analyze the ability of the conservation easements to mitigate the risk of harm to riparian areas and penstemon habitat because its FONSI was "not a mitigated FONSI." Rather, the BLM argues, it "did not find that the Land Exchange would cause environmental harm" at all, making the need for consideration

---

[4] *See e.g.* Docket #49 at 24 (BLM's response brief arguing that " Even if Petitioner had preserved [an argument relating to riparian areas], it fails <u>for the same reasons</u> as its argument concerning the Harrington's penstemon." (Emphasis added.)

of mitigation measures irrelevant.  But as set forth above, the 2014 EA, incorporating the 2012 grazing permit EA, <u>clearly</u> finds that ongoing grazing was causing substantial environmental harm to riparian areas in the Thomas Allotment, to the degree that those areas were no longer meeting Standard 2.  The 2012 EA found – and the 2014 EA effectively adopted that finding -- that aggressive grazing restrictions were required to rehabilitate those riparian areas, yet the 2014 EA acknowledges that completion of the land exchange would abrogate the 2012 grazing restrictions.  No reasonable reading of the 2014 EA could support a conclusion that completion of the land exchange <u>without</u> additional mitigating measures would nevertheless yield no significant environmental impact on riparian areas in the Thomas Allotment.[5]

The situation is slightly less clear with regard to penstemon habitats.  Both the 2012 and 2014 EAs are somewhat ambiguous as to what findings the BLM made with regard to such habitats.  On the one hand, the EAs purport to assert that the BLM's assessment teams found "no issues" with penstemon populations as a whole.  On the other hand, both EAs indicate that that finding was based on a survey of a single location and that sole survey noted that "nearly all" of the penstemon flowers in that location had been consumed by grazing livestock.  Giving due deference to the BLM's expertise and  the record, it is clear that the penstemon would be at risk from unrestricted grazing.  The record is replete with references to concerns above grazing animals harming penstemon populations, and the 2012 grazing restrictions were specifically

---

[5]     The BLM argues that the conservation easements are "<u>part</u> of the proposed agency action, not as a mitigation."  (Emphasis in original.)  This appears to be mere semantics.  The handover of the Sopris Parcel itself would undoubtedly pose a risk of environmental harm by virtue of the removal of the 2012 grazing restrictions.  Whether additional undertakings designed to avoid that risk of harm are "part of" the transaction or attempts to mitigate the adverse effects that will result from the transaction should not alter the analysis.  The BLM cannot elide its obligation to consider the efficacy of measures to mitigate environmental harm by arbitrarily declaring those measures to be "part of" a transaction instead of attendant to the transaction.

imposed to re-schedule grazing operations to prohibit grazing during penstemon flowering season. On the other hand, the conclusory assertion that the BLM's assessment team found "no issues" with penstemon populations offers no further factual elaboration nor addresses how such a conclusion could coexist with the facts suggesting ongoing harm to penstemon habitat. Thus, the record as a whole permits only the conclusion that penstemon populations were indeed at risk of harm if the 2012 grazing restrictions were lifted.

Because the record compels the conclusion that there is a risk of damage to riparian areas and penstemon habitat unless the Wexners' use of the property for grazing was restricted to at least the level set forth in the 2012 permit renewals, it was incumbent upon the BLM to identify and evaluate the proposed mitigation measures to ensure they would meet that standard, not simply observe that such measures were possible. The BLM evaluated the contemplated mitigation measures – the conservation easements granted by the Wexners – concluding that they would adequately protect penstemon habitat and riparian areas. AR 3151, 3189.

Colorado Wild argues that the BLM did not meaningfully evaluate the effectiveness of the conservation easements, particularly because the easements specifically exclude grazing activities from the easements' protection. The easements generally require the Wexners to protect the character of the Sopris Parcel (expressly including penstemon habitat). But that general protective requirement is subject to an express exception that permits the Wexners to engage in certain activities, including livestock grazing, the very activity that previously had caused damage noted by the BLM. AR 1667. If the easements ended there, the Court would agree with Colorado Wild that the exception swallows up the protections that the easements provide. But the exception for livestock grazing is itself subject to an exception that requires permitted activities like grazing to be conducted consistent with "Conservation Values"

identified in the easement, defined as "natural, scenic, open space, agricultural, and wildlife values." AR 1660. Thus, even grazing activities could not be conducted in a way to impair riparian areas or penstemon habitat. AR 1660-61 (stating that the "conservation values . . . generally include . . . riparian habitat [and] Harrington penstemon").

As a result, the record establishes that the conservation easements provide broad, ongoing protection to riparian areas and penstemon habitat in the Sopris Parcel, protections that appear to be at least equivalent to (if not broader than) the specific restrictions in the 2012 grazing permits. On this record, the Court finds that the BLM could reasonably conclude that the easements would be sufficient to address concerns relating to ongoing grazing on the Sopris Parcel.

(b). <u>The Sutey Ranch Parcel</u>

Colorado Wild also argues that the BLM violated NEPA by failing to adequately consider environmental effects that might result on the Sutey Ranch Parcel as a result of the proposed exchange, specifically, the effect that recreational use of the Sutey Ranch Parcel would have on wildlife.

The Sutey Ranch Parcel is adjacent to the BLM's Red Hill Special Recreational Management Area ("Red Hill"). Red Hill is a popular local recreation site, receiving more than 55,000 visitors per year. AR 2994. The Sutey Ranch Parcel has both "critical big game winter habitat" as well as "high dispersed recreation values" due to its location next to the Red Hill hiking trail network. AR 2993. However, the EA indicates that the BLM had "only a concept" for future management plans for the Sutey Ranch Parcel, and thus, "it cannot, and will not, be analyzed in detail in this EA." Instead, the BLM stated that a "future, site-specific management plan" for that parcel would be developed at a later time to address how issues such as "human

presence" and "wildlife habitat" would be affected by the ultimate decisions regarding the use of the Sutey Ranch Parcel.  AR 3015.

Colorado Wild's argument makes much of a passing footnote in the EA that suggests that "the Red Hill [ ] Management Plan . . . provides a justifiable template for how these lands might be managed should the land exchange be approved."  AR 3015.  Colorado Wild reads this language as suggesting that the BLM did indeed intend to extend the Red Hill's management plan to the Sutey Ranch Parcel (against the recommendation of Colorado Parks and Wildlife officials, among others).  AR 604.  But the Court reads that statement consistent with its hypothetical verb tenses: that the BLM <u>might</u> someday choose to manage Sutey Ranch as it does Red Hill, or it might not.  The Court agrees with the BLM that analyzing the environmental effects of future management decisions regarding the Sutey Ranch Parcel would be premature at this stage.  Even assuming that the BLM had some "concept" of how it might ultimately manage the Suety Ranch Parcel, "the mere contemplation of certain action is not sufficient to require an impact statement."  *Wilderness Workshop v. U.S. Bureau of Land Management*, 531 F.3d 1220, 1229 (10th Cir. 2008).  Because the future use of the Sutey Ranch Parcel remains a distant, largely speculative endeavor, the Court cannot conclude that the BLM erred by not examining the environmental impacts that might result from one possible use of it.

   2.  <u>Notice and Comment</u>

Colorado Wild's final challenge under NEPA is that the BLM did not provide for adequate notice and public comment on the proposed exchange because the BLM failed to disclose the appraisals it had obtained for each of the parcels at issue.

It is undisputed that the BLM possessed appraisals for the value of each parcel involved in the transaction as of November 2012, well before the draft EA was submitted for public

review and comment in April 2013.  The draft EA briefly discussed the "Valuation Process for

BLM Land Exchanges," but beyond commenting that only one particular appraisal method was

considered for valuing the Suety Ranch Parcel, the draft EA contains nothing more than general

discussions of the appraisal process.  AR 1958-59.

   Representatives of Colorado Wild sought to obtain copies of the appraisals, first through

a FOIA request and later through a lawsuit, but the BLM resisted until finally agreeing to

produce the appraisals in January 2014.  By that point, the time for public comment on the draft

EA had closed.  As noted above, due to the differences in the value of the parcels being

exchanged, the BLM and the Wexners agreed to reduce the size of the Sutey Ranch Parcel to go

to the BLM.  In addition, the Wexners also agreed to voluntarily donate the remaining portion.

   NEPA requires agencies to "provide public notice of . . . the availability of

environmental documents so as to inform those persons and agencies who may be interested or

affected by their proposed actions," and to "solicit appropriate information from the public" in

response.  40 C.F.R. § 1506.6(b), (d) (emphasis added).  As the BLM notes, land appraisals are

not "environmental" documents and do not implicate the environmental concerns that NEPA

addresses.  Rather, it is the FLPMA statute that requires land exchanges be of equal value.

FLPMA does not require the same notice and comment requirements as does NEPA.  Thus,

Colorado Wild founds its complaint about non-disclosure of the appraisals under NEPA, arguing

that it requires agencies to report on actions "significantly affecting the quality of the human

environment," 42 U.S.C. § 4332(c),  and that this covers the appraisals.  Colorado Wild turns to

regulations defining the term "significantly"  and notes that they require agencies to consider

both the context and intensity of environmental effects, 40 C.F.R. § 1508.27(a), (b), and that one

of the factors bearing on the intensity of an impact is whether "the action threatens a violation of

a Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(10).  Reasoning that FLMPA requires lands exchanged to have equal value and an exchange of parcels of unequal value would violate FLMPA,  Colorado Wild argues that compliance with NEPA required disclosure of the appraisals.

Colorado Wild's argument is creative but, unpersuasive. First,  42 U.S.C. § 4332(c), the statute that gives rise to 40 C.F.R. § 1508.27, is expressly concerned with actions that "affect[ ] the quality of the human environment."  This refers to a component of a physical environment and cannot be reasonably understood as encompassing of parity in the value of the parcels to be exchanged.  Likewise the regulation itself is concerned with "violation[s] of a Federal [law] imposed for the protection of the environment."  FLPMA's concern with exchange of parcels of equal value is not such a law. Presumably, the parity requirement is directed at the economic impact of the transaction – that neither the private person nor the public experience a windfall to the detriment of the other.

Second, Colorado Wild's argument springs from the premise that the land exchange here did somehow violate FLPMA, but Colorado Wild has not addressed how concealment of the appraisals might have caused that.  Colorado Wild points to no portion of FLPMA that requires disclosure of appraisals. The mere fact that the exchange that was initially contemplated involved parcels of differing value does not mean that the transaction violated FLPMA.  It merely means that the parties were required to adjust that transaction to meet the equal-value requirement, and it is undisputed that they did so.  In essence, Colorado Wild asks the Court to impose a requirement that appraisals be disclosed in case parcels to be exchanged might have different values.  While that might be good policy, the law does not currently require it.

There is something uncomfortable about the BLM concealing appraisals of the value of lands subject to a proposed exchange; it smacks of secrecy rather than transparency and thus gives rise to suspicions that the BLM is hiding some improper conduct.  Accordingly, the Court does not condone the BLM's behavior and finds that it has contributed to the bringing of this litigation.  However, finding no legal requirement for disclosure of the appraisals at an earlier point in the process, the Court rejects Colorado Wild's argument that that concealment operated to somehow violate NEPA.

**C.  FLPMA challenges**

Colorado Wild raises two challenges to the BLM's decision under FLPMA: (i) that the BLM's appraisal methodology understated the value of the Sopris Parcel, and (ii) that the BLM erred in concluding that the public interest favored approving the land exchange.

1.  Appraisal

Colorado Wild challenges the BLM's appraisal of the Sopris Parcel in two respects.  First, it contends that the value of the parcel should not have been discounted because it lacked road access.  Second, it argues that its value was unreliable because it was not based on comparable sales.

The Sopris Parcel consists of approximately 1,200 acres.  The BLM[6] noted that "access is an important issue," given that the parcel lies off County Road 111 "by several hundred feet."  The BLM noted that vehicular access to the parcel was only possible "from private roads from adjoining Two Shoes Ranch" and that such roads "are controlled by the [Wexners] and the general public is granted no legal rights to use them."  AR 2705.  The BLM determined that the

---

[6]   The appraisal was conducted by an outside consultant and subsequently approved by the BLM.  For purposes of efficiency, the Court will treat the appraisal as having been conducted by the BLM directly.

"the lack of vehicular access to any public road" was "the major detriment to rural residential development" of the parcel, limiting its possible uses to "agriculture and/or recreation."  AR 2716.  The BLM valued the properties using a Sales Comparison Approach, ultimately selecting six comparable parcels sold between 2005 and 2010, at prices ranging from $1,879 to $12,143 per acre.  AR 2721.  The BLM found that three of those six sales – those with the highest price per acreage – had vehicular access that the Sopris Parcel did not have, and the BLM adjusted the per-acre value of those properties downward by 50-75% as a result.  AR 2738.   The BLM ultimately determined that the Sopris Parcel was worth $2,500 per acre.  AR 2683.  Colorado Wild takes issue with the fact that prior purchases in the area by the Wexners themselves, at per-acre prices of $9,000 to $16,000, were not included in the BLM's appraisal.

FLPMA requires that lands proposed for an exchange be appraised according to their "highest and best use," meaning "the most probable legal use of a property."  43 C.F.R. § 2200.0-5(k).  The Uniform Appraisal Standards for Federal Land Acquisition further provide that a property's "highest and best use" is that its  "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future."  *See National Parks & Conservation Ass'n v. Bureau of Land Management*, 606 F.3d 1058, 1067 (9th Cir. 2010).

Colorado Wild argues that reducing the per-acre value of the Sopris Parcel to reflect a lack of vehicular access failed to reflect the highest and best use of the property to the Wexners, because they possessed the ability to connect the Sopris Parcel to private roads on their existing lands.  Thus, Colorado Wild argues that the appraisal of the Sopris Parcel should have valued the land as if it had vehicular access, warranting a much higher per-acre value, even though the land would support that value only if the prospective buyer had been the Wexners.

The cornerstone of the appraisal process is determining a parcel's "market value" – that is, "the most probable price . . . that lands or interests in lands should bring in a <u>competitive</u> and open market."  43 C.F.R. § 2200.0-5(n) (emphasis added).  The notion of a "competitive" market is one in which <u>multiple</u> buyers each have their own distinct interest in purchasing the parcel.  Where one potential buyer has idiosyncratic incentives to offer a substantially higher price than other buyers, the price the incentivized buyer is willing to pay is no more reflective of the "fair market value" of the parcel than the cost of a good charged by a monopolist reflects the fair market value of that good.  In several cases regarding assessment of fair market value arising in the condemnation context, the Supreme Court has indicated that "an owner who may not want to part with his land because of its special adaptability to his own use, [or] a taker who needs the land because of its peculiar fitness for the taker's purposes . . .must be disregarded by the fact finding body in arriving at 'fair' market value."  *U.S. v. Miller*, 317 U.S. 369, 374 (1943), *see also U.S. v. 564.54 Acres of Land*, 441 U.S. 506, 512 (1979) ("fair market value does not include the special value of property to the owner arising from its adaptability to his particular use"), *citing Kimball Laundry Co. v. U.S.*, 338 U.S. 1, 5 (1949) ("loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship").  The same logic applies here: the proper measure of the fair market value of the Sopris Parcel is not measured by the unique attachment that the Wexners have to it but, nor affected by the Wexners' unique ability to improve access to it by joining it to surrounding parcels that they already own, but by the diminished value that <u>any</u> hypothetical purchaser might attach to the narrow, inaccessible parcel.

Colorado Wild's argument – that the Sopris Parcel should be appraised as if it allowed vehicular access – mixes two different concepts.  Colorado Wild seems to agree with the BLM that the "highest and best use" – the anticipated future use of the parcel that would support the highest valuation – is as agricultural and grazing land.  The BLM found that "residential development is not a viable option due to the existing pedestrian access only and zoning/land use."  AR 2698.   Assuming that the access problem could be solved by the Wexners connecting the parcel up to existing private roads on the Two Shoes Ranch, the record nevertheless reflects that "zoning/land use" restrictions made residential development impractical anyway.  As such, the record supports (and Colorado Wild does not dispute) that the highest and best use of the parcel was for it to remain in agricultural and grazing use.

But once the parcel is tagged as supporting only agricultural use, the parcel's access to a road network would seem to offer little addition to its value.  Grazing livestock do not require access to a road network in order to forage, and ranchers supporting that livestock can use all-terrain vehicles to travel overland when roads are not available.   For this reason, the BLM's appraisal specifically adjusted sale prices of comparator parcels based on whether they had "adequate vehicular access for rural residential development."  AR 2738 (emphasis added).  Vehicular access to agricultural land, on the other hand, is not a characteristic that justifies an increased per-acre value.  Thus, the BLM justifiably reduced the value of comparable parcels where vehicular access sufficient to support residential development contributed to increased per-acre valuations.  Accordingly, the Court finds that the BLM did not violate FLPMA when it adjusted comparable sales to reflect a lack of vehicular access.

Second, Colorado Wild argues that the BLM's appraisal was flawed because it failed to consider the value prior purchases of land by the Wexners as comparable sales.  As noted above,

the BLM's appraisal was based on six comparable purchases made between 2005 and 2010. Colorado Wild points out that the Wexners purchased land in 2002 and 2006 to create the Two Shoes ranch, with those acquisitions constituting an average purchase price of $16,805 per acre. AR 375.   Between 2008 and 2010, the Wexners purchased additional parcels, in preparation for the instant exchange, including the Sutey Ranch purchase at per-acre prices of between $9,000 and $12,500, and the purchase of the West Crown parcel at nearly $14,000 per acre.  Colorado Wild argues that the administrative record offers no meaningful explanation as to why these sale prices were not factored into the appraisal of the Sopris Parcel.

The record reflects that the BLM appraiser conducted research "for recent sales and current listings of comparable properties," resulting in "adequate data available for the valuation analysis (despite only three closings since 2008)."  The appraisal report summarized fourteen of those transactions, dating between 2005 and 2010, finding "a very wide prices range of $1,879 to $45,767 per acre," although it does not appear that any of the Wexners' purchases were included in that group of fourteen.  Of those, the appraiser concluded that "only six of these sales are similar enough to warrant direct comparison to the subject property."[7]  AR 2720.

The Court cannot say that, simply because the BLM appraiser thought that certain other transactions were more representative of real estate market at the time, its appraisal decision was arbitrary and capricious.  When faced with more data than was necessary for the appraisal

---

[7]     Post-decisional communications between the parties produced a statement from the BLM in November 2014 that the Wexners' purchases of the parcels that became the Two Shoes Ranch were not considered comparable because they "are substantially larger and included access, improvements, significant and very valuable water rights and lakes, and most importantly, development rights."  AR 375.   The Court disregards this and other post-decisional statements because the Court is obligated to constrain its analysis to the reasons given by the agency at the time of its decision.

methodology – a methodology that Colorado Wild has not contended was inappropriate -- the appraiser was required to cull out some transactions.

Absent a showing that the transactions involving the Wexners were <u>demonstrably</u> more comparable to the Sopris Parcel than those selected by the appraiser, this Court is reluctant to second-guess the appraiser's decisions or substitute the Court's opinions for the BLM's expertise in this area.  The Court's review under the APA is a "very deferential" one, presuming the agency to have acted properly and placing the burden on Colorado Wild to prove otherwise. *Defenders of Wildlife v. Everson*, 984 F.3d 918, 934-35 (10th Cir. 2020).  Here, the mere fact that the Wexners were involved in certain transactions does not make those transactions more comparable to an appraisal than third-party transactions.  Based on the general evidence in the record, there are clear reasons why the appraiser might have chosen not to consider those sales as part of the valuation of the Sopris Parcel.  For example, the Sutey Ranch and West Crown Parcels both have a degree of vehicular access that the Sopris Parcel did not.[8]  AR 327 (Sutey Ranch Parcel "has year-round vehicular access from County Road 112"); AR 2613 (West Crown has "direct but seasonal access from County Road 111").  Ultimately, absent a showing that the BLM clearly deviated from standard appraisal practices in deciding to consider other transactions instead of those previously involving the Wexners – and no such showing has been made – the

---

[8]    As with the comparable parcels that had superior vehicular access, consideration of the Sutey Ranch, West Crown, or other parcels as comparators would have required some reduction in the per-acre value to reflect the Sopris Parcel's lack of similar access.  Using the appraiser's method for reducing those values by was much as 75% to reflect superior access, the adjusted per-acre value of the Sutey Ranch and West Crown parcels might have fallen to as low as about $3,000 per acre, not substantially more than the $2,500 the BLM concluded.  *See e.g. Greer Coalition, Inc. v. U.S. Forest Service,* 470Fed.Appx. 630, 636 (9th Cir. 2012) ("even if the appraisal should have included this sale, Plaintiffs have not shown that they were prejudiced by the omission because they do not explain how the appraiser's weighted average of comparable sales would have changed").

Court cannot conclude that the BLM's decision to appraise the parcel based on other comparators was arbitrary and capricious.

2. Public Interest

Finally, Colorado Wild argues that the BLM erred in finding that, following the lowered appraisal of the Sopris Parcel and the adjustment of the Sutey Ranch Parcel to account for it, the exchange was in the public interest.

42 U.S.C. § 1716(a) authorizes federal agencies to swap tracts of federal land for those in private hands if "the public interest will be well served by making that exchange."   The agency must "give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife," and the agency must conclude that "the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired."  *Id.*  Moreover, the same statute requires that "the values of the lands exchanged by the Secretary under this Act and by the Secretary of Agriculture under applicable law relating to lands within the National Forest System either shall be equal," with limited mechanisms available for correcting valuation disparities.  43 U.S.C. § 1716(b).

Colorado Wild first argues that the record does not support the BLM's conclusion that the Sopris Parcel was "difficult to manage" due to being an "isolated[ ] tract[ ] with limited public access."  AR 2969.  Colorado Wild argues that "the premise of this rationale – that BLM lacks access – is wrong," because the BLM obtained an easement from the prior owners of the Two Shoes Ranch to access the Sopris Parcel from ranch lands.

Colorado Wild misstates the BLM's position.  The BLM did not contend that it "lacks access" to the Sopris Parcel, merely that access was "limited" and "difficult."  Second, the fact that access to the parcel is <u>possible</u> does not preclude the possibility that the parcel is nevertheless <u>difficult</u> to access, given the need to rely upon an easement and continued good relations with the landowner subject to that easement.  Certainly, Colorado Wild does not point to evidence to the contrary to the record – *e.g.* the BLM acknowledging that the Sopris Parcel is simple to manage.

Next, Colorado Wild argues that "the wildlife values and water resources on the Sopris Parcel are greater" than the wildlife values on the Sutey Ranch parcel, contrary to the conclusions reached by the BLM.  Colorado Wild points to the fact that the Sopris Parcel offers quantitatively more wildlife habitat in terms of acreage (1,240 acres vs. 322), and that qualitatively, the Sopris Parcel offers habitat for bighorn sheep, riparian habitat, and penstemon populations while the Sutey Ranch Parcel does not.

As noted above, this Court applies a highly deferential review of the BLM's decision and is wary of substituting its opinions for the agency's expertise.  That caution is particularly appropriate when evaluating the BLM's weighing of the relative merits of possessing the federal parcels vs. the non-federal parcels.  The record does not reflect that the BLM was unaware of the factors that Colorado Wild highlights.  Rather, the record reflects that the BLM simply valued those factors differently than did Colorado Wild.  For example, the BLM's Record of Decision appears to place considerable emphasis on the acquisition of the Sutey Ranch parcel for its <u>recreational</u> characteristics, a factor that Colorado Wild's briefing does not address.  AR 2969-70 ("In addition to its natural resource values, [the Sutey Ranch Parcel] has high recreational values . . . The BLM expects the exchange to enhance recreational opportunities for the public with

improved access to public lands.")  Under these circumstances, the Court cannot adopt Colorado Wild's contention that the BLM abused its discretion by concluding that approving the exchange was in the public interest.

Finally, Colorado Wild argues that the BLM erred in evaluating the public interest element by considering the benefits of acquiring all 557 acres of the Sutey Ranch Parcel.  Once again, the exchange contemplated a swap of the entire Sutey Ranch Parcel (and others) for the Sopris Parcel, but when the appraisal of the Sopris Parcel came in lower than expected, the parties reduced the Sutey Ranch Parcel to 322 acres in order to equalize values.  The Wexners agreed to donate the remaining portion of the Sutey Ranch Parcel to the BLM.  Colorado Wild argues that the BLM's FLPMA determination was required to be based on only the 322-acre portion of the Sutey Ranch Parcel, and that the record suggests that the BLM's public interest determination considered the benefits of acquiring the entirety of the Sutey Ranch Parcel, not just the 322-acre portion in question.

The Court agrees with the BLM that a separate evaluation of the exchange portion of the transaction and the Wexners' donation of the remaining portion of the Sutey Ranch Parcel was unnecessary.  43 U.S.C § 1715(a) authorizes agencies to acquire new public lands "by purchase, exchange, [or] donation."  The record is clear that approval of the exchange involving the 322-acre portion of the Sutey Ranch Parcel was a condition of the Wexners' willingness to donate the remaining portion of that parcel as well.  Put differently, the BLM would either acquire the entirety of the Sutey Ranch Parcel, through a combination of exchange and donation, or none at all.  In such circumstances, the notion of the transaction being "the Sopris Parcel in exchange for 322 acres of the Sutey Ranch Parcel" is a convenient fiction.  The real transaction entailed an exchange for 322 acres of Sutey Ranch plus a promised donation of the remaining portion of that

parcel (plus numerous other terms mostly favorable to the BLM).  When evaluating the public interest under FLPMA, the Court cannot say that the BLM was prohibited from considering the additional value to the public of the Wexners' promise to donate the remaining portion of the Sutey Ranch Parcel, nor any of the other conditions of the exchange, such as the Wexners' agreement to conservation easements on the Sopris Parcel or various monetary donations.  FLPMA's equal-value and public interest requirements are separate inquiries, and satisfaction of one does not operate to satisfy the other.  *See Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1180 (9th Cir. 2000).  Because the two inquires are distinct, there is no reason to assume that even if the equal-value inquiry is limited to examining the parcels actually being exchanged (a finding that this Court need not make here), the public interest inquiry is similarly cabined.  Indeed, it would be foolish to preclude federal agencies from considering all of the various non-acreage components of a proposed land exchange when deciding whether the proposal is in the public interest, as collateral promises included in an exchange may provide the public with substantial benefits far beyond the benefits of the lands being exchanged themselves.

Accordingly, the Court finds that Colorado Wild has not demonstrated that the BLM violated FLPMA when approving the exchange.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court **AFFIRMS** the decision (**# 23, 31**) of the BLM approving the exchange.  The Clerk of the Court shall enter judgment in favor of the Defendants and close this case.

Dated this 25th day of March, 2021.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge